THE STATE OF CONNECTICUT *vs.* ERNEST SCHLEIFER.

Third Judicial District, Bridgeport, April Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

The relevancy of evidence offered to impeach the credibility of a witness depends upon its tendency to affect his character for truthfulness.

In ruling upon such evidence, the trial court has a large discretion as to its extent and the period to be covered, but not as to its relevancy.

In the present case, the accused was charged with making an address to a group of striking shopmen of the New York, New Haven and Hartford Railroad Company, in which he solicited and incited them to commit numerous crimes of violence. To affect his credibility, the State offered and the trial court admitted in evidence three letters, written by him in 1917, which contained admissions that he was then engaged in "preaching anarchy" and spreading "the propaganda of the social revolution," among the workers in the shipyard where he was employed by the Federal

The State *v*. Schleifer.

government in recruiting men for war service. *Held* that the trial court erred since, until it appeared that the anarchy and revolution which the accused advocated were violent and unlawful in character as distinguished from the merely peaceful and philosophical variety—a fact which could not be assumed by the trial court—the letters did not tend to impugn the veracity of the accused.

After the accused, upon cross-examination, had explained his understanding of the term "scab," it was permissible for the State's Attorney to read to him from a card a definition written by a prominent novelist and to ask the accused whether he agreed with it; but after his affirmative answer the card itself should not have been admitted in evidence, and was later properly stricken out by the trial court, since to have permitted it to go to the jury room as an exhibit would have been to accord to the answer in question more weight than to other answers not marked as exhibits.

To present the conditions immediately surrounding the alleged criminal speech, which was delivered on November 22d, 1922, and to explain one of the statements in it that "things are running too smooth on the New Haven Road," the State offered, and the trial court admitted, a mass of evidence dealing with the entire history and progress of the strike from its inception on July 1st, 1922. *Held* that this constituted an abuse of the trial court's discretion to permit reasonable inquiry into the circumstances surrounding the speech since, to compel the accused to meet the proof of such conditions for a period of more than one month, placed an undue burden upon him and exposed him to serious prejudice.

The fact that the Federal District Court had issued an injunction and restraining order against the striking employees was admissible as one of the surrounding circumstances and to explain the exhortation of the accused to his audience, "don't let the injunction stop you from trimming these scabs"; but it was error for the trial court to admit copies of them as exhibits, since they contained long recitals of acts of violence committed by the strikers which, as to the accused who was not a party to the proceedings, were hearsay.

After a prominent officer of the union had testified on behalf of the accused concerning the extensive police protection employed to curb the strikers, the State was permitted, on cross-examination, to question him at great length as to numerous acts of violence with which no attempt was made to connect the accused, and as to his own promise, made to the prosecuting officials, to discipline the members of his union who had committed such acts. *Held* that this evidence was seriously harmful to the

accused, and inadmissible, either, as claimed by the State, to contradict such inference of the efficacy of the police protection as might be drawn from the witness' direct examination, or to disclose his bias, prejudice, or interest.

It was proper for the State to show that the various devices which the accused advised his audience to employ in order to damage and destroy the engines and cars, were practicable and were a familiar part of the railroad equipment.

A memorandum which, at most, can only be used by a witness to refresh his recollection, should not be marked for identification, since this course tends to dignify it as an exhibit in the eyes of the jury.

In cross-examining the president of the union, a witness for the defense, as to his acquaintance with the accused, the question, "Did you feel that you would like to know where Mr. Schleifer came from?" was improper.

After this same witness had characterized a vice-president of a large railroad company as the "notorious Atterbury," it was permissible for the State to question him concerning Mr. Atterbury's relations with organized labor and his patriotic services during the war; and it was likewise permissible to elicit the significance of the witness' reference to the Boston police force as a "bunch of scabs," in order to indicate his bias and prejudice.

Upon cross-examination of the accused, he was asked whether he approved of this description of the Boston police force. *Held* that this violated the rule that one witness should never be asked to characterize the testimony or statement of another.

After the accused had asserted that a certain Federal judge was an "appointee" of the Attorney-General of the United States and that the restraining order which he had issued against the strikers in another jurisdiction was a "fool injunction," and a "joke," the State's Attorney incorporated a part of the judge's opinion in a question addressed to the accused. *Held* that such an attempt to introduce a collateral matter went beyond the scope of allowable inquiry; but that it was open to the accused, as corroborative of his statements, to offer the testimony of an experienced journalist to the effect that he had seen numerous newspaper articles upon the subject of the unconstitutionality of the injunction.

The trial court committed no error in charging the jury that, in weighing the defendant's testimony, they should take into consideration his position as the accused and his great interest in the outcome of the case.

It is within the discretion of a trial court to incorporate in the main body of its charge the definition of a juror's duty set forth in *State* v. *Smith,* 49 Conn. 376; though it is the better practice to

The State *v.* Schleifer.

hold this instruction in reserve to be read in the event of a disagreement.

The trial court's statement that a "police officer who is found to be untruthful immediately loses all usefulness as an officer" took unwarranted judicial notice of the ethics of police departments.

The trial court did not abuse its power of guiding the jury without directing them when it charged that if they found that the speech was delivered by the accused substantially as alleged, the criminal "intent seems to me to follow as a matter of course"; nor when he explained to the jury that the great mass of the evidence had little to do with the main issue of what the accused said in his speech.

A party who introduces evidence solely to affect the credibility of a witness, cannot later contradict the explanation of such evidence offered by the witness.

To explain his letters concerning anarchy and the social revolution, the accused introduced certain newspaper accounts which were concerned wholly with the trial of one Mooney for the commission of a bomb outrage in San Francisco when a great throng of people had gathered to watch a preparedness parade. *Held* that it was improper for the State's Attorney to use this evidence for a purpose other than that for which it was admitted in order to imply repeatedly in his argument that the speech of the accused was calculated to incite his hearers to commit a similar crime upon the vast assemblage of people about to visit New Haven for the Yale-Harvard football game.

Reports made to the chief of police concerning acts of violence committed by the strikers were, as to the accused, hearsay and properly excluded.

The speech as recited in the information consisted of several sentences or groups of sentences, each one of which solicited the commission of a distinct and independent crime. The trial court charged the jury that, to secure a conviction, the State must prove that the accused had uttered in substance all the language alleged. *Held* that the trial court erred, since proof beyond a reasonable doubt that the accused had solicited the commission of any one of the crimes would justify a verdict of guilty.

When one is charged with soliciting others by a public speech to commit crime, the fact that he has made similar speeches before and after the one in question is admissible against him, if not too remote in time, as tending to prove that all were delivered with a like intent and that the language was designed to have the effect which is indicated on its face.

Argued April 21st—decided July 30th, 1925.

INFORMATION charging the accused with soliciting and inciting others to commit crimes of violence, brought to the Superior Court in New Haven County and tried to the jury before *Jennings, J.;* verdict and judgment of guilty, and appeal by the accused. *Error and new trial ordered.*

*Benjamin Slade* and *Thomas J. Spellacy,* with whom was *Louis Weinstein,* for the appellant (the accused).

*Arnon A. Alling,* State's Attorney, for the appellee (the State).

WHEELER, C. J. The information upon which the accused was upon trial was before us upon a motion to quash. 99 Conn. 432, 121 Atl. 805. It charges the common-law crime of solicitation. The State offered evidence to prove that there existed on November 22d, 1922, a strike of the shopmen on the New Haven railroad and that at a meeting of the strikers in New Haven on this day the accused addressed them in substance as follows:

"You will never win the strike with soft methods. You young men ought to go out on the bridge. Don't use eggs, use coal or indelible ink. Break foremen's windows at their homes. Watch the scabs when they come from work, lay for them, especially on pay day. Take them in a dark alley and hit them with a lead pipe. That is the softest thing you can use. Reimburse yourselves for what we have sacrificed for five months. Don't forget to bump off a few now and then, so Mr. Pearson will know that you are not getting cold feet. You car men know how to take a brake-shoe off. Take the brake-shoe and put it under something that will put the cars off the irons. A little sand or emery in the journal boxes will help greatly. Don't be satisfied

with trimming the engines. Put some of the cars on the bum. Also, if convenient, put something in between the frames and rods of engines on sidings. Get busy young fellows, and trim these scabs. Things are running too smooth on the New Haven Road, but let me hear from you while I am here. Go ahead and rip things and don't let the injunction stop you from trimming these scabs. Don't forget to tie them up with derailments. You boys ought to cut them all up."

On the part of the accused the assignments of error, eighty in number, include exceptions to the rulings on evidence, to the charge as made, to the requests to charge refused, and to the argument of the State's Attorney. The bill of exceptions by the State covers certain rulings on evidence adverse to the State, and the charge of the court in one particular. We take up these several matters in the order stated.

In 1917, the accused was an organizer for the International Association of Machinists, which is affiliated with the American Federation of Labor, and at the same time in the service of the United States Government without pay, in recruiting men for war service at the Fore River shipyard. The State, upon cross-examination of the accused while a witness in his own behalf, offered in evidence for the purpose of affecting his credibility three letters which indicated that at the time he was serving the Government in wartime he was preaching anarchy and advocating the social revolution among the employees of this shipyard. The court admitted the letters over the objection that they were irrelevant, concerned collateral matter, would tend to create prejudice against the accused, were remote, and did not affect his credibility. If the letters disclosed a commercial fraud on the part of the accused they would affect his credibility. If they disclosed that he was in the service of the Government in this ship-

yard, and at the same time advocating to the employees the overthrow by violence of the Government, the letters were admissible as affecting the truthfulness, that is, the integrity, of the accused. This was undoubtedly the position of the trial court. It was, under the circumstances before the trial court, erroneous. One of the letters states that the accused was "preaching anarchy," and another that he was spreading "the propaganda of the Social Revolution." In one letter he addressed, "Dear Comrade," in one he closed, "For a revolutionary success," in the other, "For the revolution." The State inquired of the accused upon cross-examination what was his definition of anarchy; this and the whole subject of anarchy the court excluded as one "upon which perhaps good men might differ." The court was right; anarchy has several meanings. "At its best," Webster's Unabridged Dictionary says, "it stands for a society made orderly by good manners rather than by law, in which each person produces according to his powers, and receives according to his needs. At its worst, it stands for a terroristic resistance of all present government and social order."

Gitlow was convicted of the statutory crime of criminal anarchy, under New York Penal Laws, §§ 160, 161. Section 160 provides: "Criminal anarchy is the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head, or of any of the executive officials of government, or by any unlawful means. The advocacy of such doctrine either by word of mouth or writing is a felony." In the appeal from this conviction, Mr. Justice Sanford thus construes this statute: "The statute does not penalize the utterance or publication of abstract 'doctrine' or academic discussion having no quality of incitement to any concrete action. It is not aimed against mere historical or philosophical

essays. It does not restrain the advocacy of changes in the form of government by constitutional and lawful means. What it prohibits is language advocating, advising or teaching the overthrow of organized government by unlawful means. These words imply urging to action. . . . That a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace, is not open to question. . . . And a State may penalize utterances which openly advocate the overthrow of the representative and constitutional form of government of the United States and the several States, by violence or other unlawful means." *Gitlow* v. *People of the State of New York,* 45 Sup. Ct. 625, 629, 630.

If the accused meant in any of these letters the second of these meanings, then we think the letter was admissible as affecting his credibility, but if it meant the first, the philosophical use of this word, then it could not affect his credibility because there was no disloyalty to government in his advocacy; it was simply lawful propaganda by peaceful methods.

Our general rule of practice requires this conclusion. The particular acts of misconduct which may be inquired of a witness must be relevant to those which affect his character for veracity. The letters which admit the preaching of anarchy were not relevant because they did not tend to affect the character of the accused for truthfulness. *Dore* v. *Babcock,* 74 Conn. 425, 430, 50 Atl. 1016; *Shailer* v. *Bullock,* 78 Conn. 65, 68, 70, 61 Atl. 65. We do not intend by this holding to limit our rule that the credibility of a witness is largely discretionary as to the period to be covered and the extent; the question of relevancy is never within the discretion of the trial court. What we have said

as to anarchy is applicable to the preaching of the social revolution. There is nothing in the letters or in the record which made this relevant. A court cannot of its own volition assume that when one uses the term "anarchy" or the "social revolution," he means the overthrow of government or society by terroristic or any other unlawful means. If the meaning can be determined by the court from an inspection of the letters in the light of the surrounding circumstances, the court can determine the meaning without the aid of extraneous evidence; if this cannot be done without evidence, the court cannot assume one of several meanings and admit evidence which would be admissible with this meaning, but inadmissible if another meaning were intended.

The accused on direct examination described those who had taken the places of shopmen out on strike as "scabs." On cross-examination he defined a scab. He was then inquired of if he was in accord with the definition of a scab found upon a card handed him. Over objection and exception he answered yes. The card was then laid in evidence. The definition it gave was a most vivid and venomous one. Later in the case the court struck this from the record. It had already been read to the jury and was of such a character that it had probably left its ineffaceable impress upon the mind of the jury, but regardless of this, we think it was perfectly admissible to read the definition and ask the witness if he was in accord with it. The question is upon the same basis as the question asked of an expert, as to whether he is in accord with a statement appearing in a recognized authority. If his answer be yes, the page of the authority read from cannot be laid in evidence as an exhibit, and for a like reason this definition, purporting to come from a popular novelist, cannot be laid in evidence. To lay it in

The State *v.* Schleifer.

evidence as an exhibit would take it to the jury room and accord this answer more weight than other answers not marked as exhibits. It follows that the ruling of the court in first admitting this question was not erroneous.

Evidence was offered by the State and admitted over objection and exception by the accused, of the date of the strike, July 1st, 1922, and of its continuance up to and including November 22d, 1922, of the classes of employees who struck aggregating nearly 100% in and around New Haven, of the progress of the strike from that date until November 22d, 1922, and of the condition of the New Haven road in the operation of its trains and in its equipment, deteriorating up to about August 15th, and thereafter steadily improving until November 22d, when it had reached 75% of normal. The court admitted this evidence in order to present the conditions existing on November 22d, and the period immediately surrounding it. The State claimed to prove these conditions to meet and explain the charge in the information, "Things are running too smooth on the New Haven road." Evidence concerning these several subjects upon the date of the crimes with which the accused was charged and in the period immediately surrounding this date was admissible. The rule adopted by the court was the true one. Its application of the rule is the questionable part of the ruling. The difficulty in application arises in determining the extent of the period immediately surrounding this date. We think facts occurring in July and August do not tend to explain the conditions existing on November 22d. What would be a reasonable period within which to permit evidence of the conditions relating to this strike is a matter of judgment, and hence largely one of judicial discretion. The evidence offered was too remote. Evidence of that nature covering a

period of a month would furnish all the background of facts with which to explain the occurrence of November 22d. The ruling made required the accused to meet the proof of this condition for a period of nearly five months, which was placing upon him an undue burden. A necessary consequence of the introduction of such evidence was the liability of the jury holding the accused responsible for this condition, and thus creating prejudice against him for the crimes charged which occurred long after. We do not pause to consider whether this evidence was so harmful as to constitute reversible error, since there are at least two classes of evidence admitted during this period which could not be admissible unless connected with the accused in such way as to make him responsible therefor.

The State offered in evidence a restraining order and an injunction issued by the Federal court against the striking employees about August 18th, 1922. These contained long recitals of acts of violence against those taking the place of the striking shopmen, together with an injunctive order against the perpetration of all illegal acts of a like or similar character. These exhibits could not help but be gravely harmful to the accused. They contained recitals of facts upon which judicial action had been taken. He was not a party to the proceedings. He had, so far as the record shows, no connection with the acts enjoined. Moreover, the State does not claim that the accused was connected directly or indirectly with the subject-matter of the injunction. The facts it recites were not proved by the mere recital. As to the accused it was hearsay, its subject-matter was irrelevant and it could not be admitted against the accused unless he were a party to the court proceeding. The State claims this evidence as proof of the fact that an injunction had been issued,

and as corroborative of what the information alleges the accused said, "Go ahead and rip things, and don't let the injunction stop you from trimming these scabs," and as proof that the accused knew and was presumed to know that this injunction had been issued, and to show that there were numerous acts of violence testified to before Judge Thomas, and that after the issuance of the injunction the acts of violence against the employees fell off in large numbers. The court admitted the injunction proceedings as one of the circumstances existing at the time of the alleged statement by the accused, and as the injunction referred to by the accused in his speech. It was proper to prove the fact of the issue of this injunction and restraining order; it was not necessary or proper in proving this fact to lay in evidence these recitals of violence even though the accused testified he knew that the injunction had issued. The injunction and restraining order were collateral issues and wholly irrelevant to the charge against the accused. They could not tend to prove his guilty intent. As to him they were pure hearsay.

Ready testified as a witness in behalf of the accused, that he was chairman of the meeting at which Schleifer spoke, and was also president of System Federation number 17, affiliated with the Railroad Employees' Department of the American Federation of Labor; that innumerable policemen, some in the employ of the railroad and some in the employ of the city of New Haven, and many armed with billies three and four feet long, and with revolvers displayed in belted holsters, were constantly on duty in the vicinity of the New Haven railroad station and the adjoining and adjacent highways and properties. On cross-examination the State's Attorney inquired of him as to numerous acts of violence committed by the strikers about

August 1st, and as to whether he had promised the prosecuting officials to help them protect the public by having the strikers who had committed the acts of violence disciplined by the local union, for the purpose of disproving the object of his testimony as to the protection afforded by these numerous police, by showing that it was not efficacious, and for the purpose of showing the bias, prejudice and interest of the witness. The testimony of the witness as to the police was as to facts. He did not testify as to the inference to be drawn from the evidence, or suggest that his purpose was to show that the police protection was efficacious. It was permissible for the State to disprove the truth of these facts by cross-examination as to these, but the State could not prove by the witness a large number of acts of violence, the facts relating to the conviction of some of these strikers for these acts, and a mass of related detail, and thus to show that the protection was not as effective as the evidence of the witness might lead one to infer. Under no possible theory of evidence could this method of introducing into the case all the detail of these many acts of violence be justified. No attempt was made to connect the accused with them and the evidence must have seriously prejudiced the case of the accused before the jury. The evidence was claimed and admitted upon the further ground that it disclosed the bias, prejudice, and interest of the witness. That is, we think, a rather tenuous ground upon which to secure the admission on cross-examination of all these many acts of violence. It rests upon the witness' knowledge of these acts, his promise to have the union take action in reference to them, and his failure to so act. The witness' testimony on direct was within a narrow compass; by reason of the liberality of this ruling, the taking of his testimony was protracted over two days. The objections to this attempt

to thus bring before the jury these many acts of violence by the strikers should have been sustained. Neither the union nor Ready was on trial. It was impossible to expect a jury of laymen to hear all about these acts of violence and the outrages perpetrated by the strikers and not associate responsibility for them with the accused.

The State offered evidence through Oviatt to prove the method available in carrying out the advice which it claimed the accused made to the meeting; (1) to take the brake-shoe and put it under something that will put the cars off the irons; (2) to put sand or emery in the journal boxes; (3) to put something in between the frames and rods of the engines. It also offered evidence to prove that the engine could be crippled by putting a small piece of steel upon the guide of an engine close to the cylinder. This also tended to prove the method by which the alleged advice of the accused to trim the engines could be carried out. The exception to the admission of this evidence was not well taken. The evidence of the means by which the accused's alleged advice could be carried out tended to show its practicality in accomplishing the purpose of the advice to cripple the engines and cars of the New Haven road and cause their derailment. The evidence of the fact that the instrumentalities with which these purposes could be accomplished were a part of the equipment of the road and used by its maintenance men, tended to prove that the advice to this meeting was given to men familiar with the uses of these instrumentalities and that they were being used by the road.

The State offered evidence to prove that Satti and Marks, the detectives of the New Haven road who testified to what the accused said in his speech to the meeting, and, against objection, testified that they immediately went from the meeting to a nearby drug

store and made memoranda of what the accused had said at the meeting. These memoranda were marked for identification on the State's motion, but not introduced in evidence. The State was entitled to show the fact that the memoranda had been made, and the witnesses entitled to use them to refresh their recollection. They ought not to have been marked for identification, since the State never had the intention of offering them in evidence and could not have done so. The method adopted by the State tended to dignify the memoranda as exhibits in the eyes of the jury. Memoranda not intended to be offered in evidence should not be marked as exhibits for identification. We do not, of course, regard this as a reversible error.

Reardon, the president of Local number 391, International Association of Machinists of Hyde Park, Massachusetts, and also president of District number 43 of the International Association of Machinists, which comprised all of the locals of machinists and helpers on the New Haven and Central New England railroads, testified as to the accused's speech at the meeting of November 22d. On cross-examination he was asked concerning his acquaintance with the accused, and inquired of, over the accused's exception, "Did you feel that you would like to know where Mr. Schleifer came from?" This was inadmissible cross-examination and a waste of time and should have been excluded. The witness in his direct examination testified concerning vice-president Atterbury of the Pennsylvania railroad, characterizing him as the notorious Atterbury. On cross-examination he explained that he only knew him by reputation, and, against objection, testified that he was known among railroad men as very unfair to railroad laborers. He was cross-examined, against objection, at length as to this statement and as to General Atterbury's important war service on the other side

during the World War. We see no ground of objection in the subject-matter of this cross-examination; it was brought out by the voluntary statement of the witness. The one ground of legitimate criticism of this cross-examination is its lack of sense of proportion in unduly extending an unimportant incident of the trial. The State's cross-examination of Reardon concerning his statement that the Boston police force were a bunch of scabs, by inquiring as to the particular force he referred to being the new force taking the place of the old force after the Boston police strike, and by other questions designed to evince the prejudice and interest of the witness, was relevant cross-examination.

Questions asked of the accused on cross-examination as to where and with whom he had lived, and as to the belief he expressed, in chief, of the right to confiscate the railroads of the country, and as to his meaning, whether with or without compensation, were clearly admissible in view of his direct examination, which contained many wholly volunteered statements. The accused testified that the Daugherty injunction was a fool injunction, and that the judge (Wilkinson) who issued the injunction had been appointed by Attorney-General Daugherty. The State thereupon was permited upon cross-examination to ask the witnes if he didn't regard Judge Wilkinson as a pocket judge? And upon his answering no, the State's Attorney inquired of him in a number of questions as to his statement that Daugherty had made the judge. He then asked him: "Q. Do you recall this statement in the opinion of Judge Wilkinson?" Upon objection being made to incorporating a part of the opinion of Judge Wilkinson in the question, the court overruled the objection and permitted him to read from the opinion a part, to the point that the bill for an injunction was one in the public interest by the government

to enjoin an unlawful conspiracy, and to incorporate this in a question. The question was never answered. It went too far. It had no apparent purpose except to introduce a collateral matter. *Buckingham's Appeal,* 60 Conn. 143, 160, 22 Atl. 509.

Error fifty-five complains of the continued inquiry of the accused on cross-examination upon a subject after an inquiry upon this subject had been excluded. It would be bad practice not to accept the ruling of the court when definitely made, but we cannot hold in this instance that the State's Attorney was subject to this criticism. The question asked of the accused, whether he approved of Reardon's characterization of the Boston police force as "scabs," was improper and should, upon objection, have been excluded. It is never permissible, though often done, to ask a witness to characterize the testimony or statement of another witness. Prejudicial error cannot be predicated upon a ruling of this character. The accused testified on cross-examination that he formed the opinion that the Daugherty injunction issued by Judge Wilkinson was a joke, in part from certain newspaper articles contending that the injunction was unconstitutional. In order to corroborate the accused's statement, the witness for the accused, Troup, an experienced newspaper man familiar with the articles published by the Press of the country on the Daugherty injunction, was inquired of whether he saw "articles with reference to the Daugherty injunction on the subject of its being unconstitutional." The court excluded the question and the defendant excepted. The inquiry, under the condition of the evidence, was admissible, but it is too inconsequential a matter to predicate error upon.

Errors in failing to charge as requested, and in the charge as made, are not of serious import. Requests to charge that the jury were not concerned with any

claimed violation of the injunction issued by Judge Thomas; that the accused cannot be affected by the convictions for crimes of strikers; that the defendant cannot be bound by anything which others said and did in his absence, have been covered by the discussion of whether these matters were admissible in evidence. The other requests, so far as essential, are a part of the charge. The charge, in relation to the testimony of the accused, complained of, "above all, you are to take into consideration that he is the accused in this case and his great interest in the result of the same," was correct. *State* v. *Fiske,* 63 Conn. 388, 392, 28 Atl. 572. The incorporation of the duty of the juror as stated in *State* v. *Smith,* 49 Conn. 376, in the charge, was novel but not erroneous. Ordinarily this instruction is read to a disagreeing jury, and its effectiveness in bringing jurors to an agreement has lead triers ever since its pronouncement to withhold its reading until the time of disagreement. This is a matter of practical judgment and the uniform experience of nearly forty years disagrees with the practice of the trial judge in this case. It is, however, correct doctrine whether read into the charge, or later read to the jury in the case of persistent disagreement. The court's charge that a police "officer who is found to be untruthful immediately loses all usefulness as an officer," takes judicial notice of the code of ethics of a police department, a subject of which a court cannot take judicial notice. This, again, is too inconsequential to predicate error upon.

The charge, upon the subject of intent was unexceptionable: "A criminal intent is sufficiently evidenced by other facts and circumstances from which no reasonable inference of other than a criminal intent on the part of the accused can be drawn. In arriving at a decision on this point you may and should consider, not

only the words spoken, but the manner of speaking and of the speaker, the occasion which called them forth, and all other surrounding circumstances." The court did not leave the jury with these general principles, but added: "While it is for you to find this intent, and while you are not bound, as I told you before, by any opinion I may express on the facts, I think it is only fair to say to you that if you find that the speech was delivered substantially as alleged, the intent seems to me to follow as a matter of course." In this the court was within our practice and very properly guiding the jury without directing them. *State* v. *Fetterer*, 65 Conn. 287, 32 Atl. 394. We see no possibility of harm to the accused in the attempt of the court by illustrations from the testimony to show them that the great mass of the testimony was admitted either to test the credibility or memory of the witnesses, to show their prejudice or bias, or the circumstances under which the speech was made, while the main question was as to what the accused said at the meeting.

Error is assigned because of the prejudicial character of the argument of the State's Attorney in several particulars. The charge upon which the accused was on trial was not that of being a slacker or a traitor in the late war. The emphasis placed upon these subjects in the State's Attorney's argument would tend to influence the jury unfavorably toward the accused. Argument along these lines was comment directly arising from the introduction of the letters, Exhibits ten, eleven, and twelve, which we have held to have been improperly admitted. We cannot hold that this argument was not, in substance, responsive to these letters, and hence, in substance it was not improper. Upon a new trial the accused will be tried and the case argued upon the charge in the information, and it will not be

The State *v.* Schleifer.

involved with the consideration of his having been a slacker and a traitor.

The complaint of the State's Attorney's reference four times in the course of his argument to "who spilled the beans," as an attempt upon his part to suggest to the jury that there were others who could testify to the making of the speech besides Marks and Satti, is far-fetched. We find nothing of so vital interest in this continued repetition of an apparently immaterial matter. The complaint of the State's Attorney's frequent reference to Exhibit thirteen, as to the definition of a scab, when it had been excluded from the consideration of the jury, was certainly improper, but we do not think this reversible error.

After the introduction of the letters, Exhibits ten, eleven and twelve, the defense was permitted to introduce three pamphlets referred to in these letters as part of the bundle, and which were concerned wholly with the Mooney case, and the accused stated that he distributed these pamphlets through his interest in the Mooney case and as a labor organizer. Exhibits ten, eleven and twelve were admitted to affect the credibility of the witness, and the State could not contradict the explanation given by the accused of the letters and the bundle of pamphlets or newspapers referred to therein. *Shailer* v. *Bullock,* 78 Conn. 65, 70, 61 Atl. 85. The newspapers contained long accounts of the Mooney case and of the bomb outrage for which Mooney was prosecuted. In the course of his argument the State's Attorney said that the preparedness parade in San Francisco, referred to in the account of the Mooney case, was just the day to touch off the bomb, and then he said: "Think that over as to whether or not these things are possible. They do happen." Preparedness Day was probably the equal, in the number of those assembled, of the Yale-Harvard

football game to occur a few days after this speech of the accused. Then, holding up the pamphlets introduced, which related to the Mooney case, he said, "These things do happen, sirs." The implication was unmistakable. The bomb had been touched off in San Francisco on Preparedness Day, and so the accused was inciting his hearers to a similar crime upon the vast assemblage of people to gather in New Haven at the Yale-Harvard football game in a few days. The argument was based upon an illegal use of evidence received solely to test the credibility of the witness, and it was manifestly unfair. It was not a chance utterance, but one twice repeated with the necessary explanatory introduction, and could not help but tend to prejudice the accused with the jury. As this whole subject-matter will not probably again be presented in this case, we state without further discussion that this implication would not have been permissible upon the State's cross-examination had these exhibits been properly admitted in evidence.

We pass now to the State's bill of exceptions. The State's inquiry on direct examination of Mr. Foster and Chief McMahon, whether, after the issuance about August 18th by Judge Thomas of the injunction, they noticed that the acts of violence against the New Haven road's employees seemed to diminish, was properly excluded for the reasons heretofore given in discussing the admissibility of acts of violence between July and November, 1922. The State's offer of reports made to Chief McMahon of acts of violence against the employees of the New Haven road were properly excluded. They were hearsay, and in no wise connected with the accused.

The State complains of this part of the charge: "The charge is that, in substance, he spoke as alleged." After giving two definitions of the meaning of "in

substance," the court continues: "Remembering the two definitions you will observe that they agree in this; that the words proved must include the material or essential parts of the words alleged. Applying this definition to the facts of the case before us, you will note that the speech alleged to have been made falls into a number of independent sentences; the State must prove that Schleifer spoke the substance, as above defined, of all the statements attributed to him, although it is not necessary to prove that they were spoken in the order in which they appear in the information. Having chosen to charge this offense in the language of the information, the State is held to a proof of the language charged, and again in substance of all of it." The speech as recited in the information solicits the commission of a number of independent crimes. If the State were unable to prove the solicitation as to two of these crimes under this charge, its case must fail. The true construction of this information is that it charges the solicitation to commit any one of a number of crimes, and the proof of the solicitation as charged of any one of these beyond a reasonable doubt would justify a verdict and judgment of guilty. The charge as made imposed upon the State far too heavy a burden and one which might easily produce miscarriage of justice.

The accused was inquired of on cross-examination: "Did you not in Meadville, Pennsylvania, advise and counsel violence?" (Referring to about September 17th, 1922, and at a time when the accused was organizer of a labor organization, and when a part of his duties was to speak to local unions of shopmen.) The question was admitted over objection by counsel for the accused. The State also offered evidence, in chief, to prove that in September, 1922, prior to the New Haven speech and succeeding it on the night of No-

vember 22d, at New London, the accused, as an organizer of the International Association of Machinists, had incited and counselled the strikers to commit acts of violence against those who had not gone on strike and those who had taken the place of those who had gone on strike. The court excluded the evidence and the State excepted. The State claimed the evidence, not for the purpose of proving that the accused spoke the words charged, but for the purpose of proving that when he said them he did so intending to incite and procure the commission of divers felonies and aggravated crimes. When one is charged with inciting by public speech his hearers to a criminal course, the fact that he has made speeches of like character, prior to and subsequent to this public speech, if not too remote in time, does tend to prove that he made all of these speeches with a like intent and that he meant the words of his speech should have the effect which his words indicate.

In *New York Mutual Life Ins. Co.* v. *Armstrong,* 117 U. S. 591, 599, 6 Sup. Ct. 877, the claim was that insurance was procured by H. on the life of A. to cheat and defraud an insurance company. Evidence that H. effected other insurance upon the life of the insured in other companies at or about the same time for the like fraudulent purpose was held admissible. Numerous cases of fraud are cited where evidence of like character was admitted to show the intent or motive with which the fraud in suit was committed. Mr. Justice Field refers to Mr. Justice Story's opinion in *Bottomley* v. *United States,* 1 Story, 135, 144, in which he cites several instances of the application of this rule: "Thus, in the case of a prosecution for uttering counterfeit money, the fact that the prisoner has in his possession, or has uttered, other counterfeit money, is held to be proper evidence to show his guilty knowledge;

and upon an indictment for receiving stolen goods, evidence that the prisoner had received at various other times different parcels of goods which had been stolen from the same persons is held admissible in proof of his guilty knowledge. So, on an indictment for a conspiracy to create public discontent and disaffection, proof is admissible against the prisoner that at another meeting held for an object professedly similar, at which the prisoner was chairman, resolutions were passed of a character to create such discontent and disaffection." We made a like ruling in *Hoxie* v. *Home Ins. Co.,* 32 Conn. 21, where defendant made the claim that insurance was fraudulently procured with intent that the vessel should be lost. We held that defendant might show a series of losses under suspicious circumstances of other vessels owned by one of the same parties and mortgaged in the same manner to the plaintiff, in order to prove intent.

In a prosecution for obstructing and attempting to obstruct recruiting by a speech, the accused's approval of a document expressing and advocating opposition to the war was admitted against him as evidence of his intent. In his opinion, Mr. Justice Holmes said: "Evidence that the defendant accepted this view and this declaration of his duties at the time that he made his speech is evidence that if in that speech he used words tending to obstruct the recruiting service he meant that they should have that effect. The principle is too well established and too manifestly good sense to need citation of the books." *Debs* v. *United States,* 249 U. S. 211, 216, 39 Sup. Ct. 252. Similar rulings were made in the United States Circuit Court of Appeals in *Kirchner* v. *United States,* 255 Fed. 301; *Rhuberg* v. *United States,* 255 Fed. 865, and *Equi* v. *United States,* 261 Fed. 53.

The other assignments of error are either so mani-

festly bad, or their subject-matter so immaterial, as to justify an omission of their consideration.

There is error and a new trial is ordered.

In this opinion BEACH, CURTIS and KEELER, Js., concurred.

MALTBIE, J. (dissenting). In a trial occupying twelve or more court days, with its record of more than nine hundred pages of testimony crowded with almost innumerable objections, my associates find, as I read the majority opinion, three rulings upon evidence and a brief passage of argument upon which to base a decision of reversal. The waste of time, effort and money which that conclusion entails and the revival of old issues and stirring of old antagonisms which must follow would at least require a careful weighing of these claims of error to determine whether they are sound in fact and sufficient in law. So considered they seem to me wholly inadequate.

The accused while acting as the agent of the government in time of war used the means of approach to the workers in its shipyards thereby afforded to preach anarchy and agitate for the social revolution; whether he intended the overthrow of government by violence or advocated only peaceable methods, while serving the established order he was planning its destruction; what man-on-the-street, called upon to weigh his honesty and sincerity and knowing that fact, would not give it serious heed? The objection made at the trial to the injunction and restraining order was not to the recitals in it, but to its admissibility as a whole, and the ground of reversal which this court finds was never presented to the trial court; moreover, the majority opinion grants that proof of the bare fact of its issuance was proper, but how, under the best evidence rule, could

that be made except by putting in the document itself? Ready was one of the accused's chief witnesses upon the issue of the making of the speech as alleged in the information, and he had also given testimony as to the policing of the railroad for the only apparent purpose of rebutting by inference evidence offered by the State as to acts of violence; surely it was within the reasonable discretion of the trial court to permit cross-examination to show his attitude toward illegal deeds similar to those the State charged the accused with advocating, and certainly it was proper to rebut the inference which might be drawn from his testimony by proof of facts indicating that it was not sound. The imminence of the Yale-Harvard football game, with its attendant crowds, was a circumstance which might properly be shown, and, being shown, commented upon; the parallel between that situation and the circumstances surrounding the bomb outrage at the Preparedness Day parade in San Francisco, a matter which had been imported into the case by the accused in answer to questions by his own counsel, was too apt an illustration of the dire results which might be expected to follow upon the inflammatory speech charged against him, too vivid a characterization of the nature and probable intent of that speech, not to be brought to the attention of the jury; and the holding up of the documents, papers introduced in the case by the accused himself as his own exhibits, was merely an oratorical gesture.

I have reviewed these claims of error very briefly because, if my dissent went no deeper, I would not have cumbered the Reports with a discussion of its grounds. But I cannot read the majority opinion, as I cannot read the opinions in several other recent decisions of this court in important criminal cases, without feeling that they have been made largely to turn upon the

question whether the particular accused in the particular case was deemed to have had a "fair trial." Anglo-Saxon jurisprudence is not designed to do justice to each individual accused arraigned before the court, but the end sought has been the establishment of orderly procedure by the formulation of rules, rules which will indeed do justice in the majority of cases, but which must be applied even though injustice may now and then result. Certainty and speed in the punishment of crime are much more to be desired than severity of sentence, and they can only come about when justice is administered along fixed lines, so that those engaged in the trial of cases may have their course clearly charted for them; and where the multiplicity of determining circumstances is such that only a broad rule can be laid down, and its application must be left to the exercise of sound sense in the particular case, in legal phraseology, where the matter is one of discretion, that discretion must in all but the extreme case, be lodged in the trial court, not in this court. A "fair trial" to the accused does not require that every possible protection shall be thrown about him, but over against his right must be set the right of society to protect itself against crime and social disorder. As Chief Justice Taft suggested in a lecture some years ago: Criminal procedure should be so framed as to "reach the golden mean between preserving the interests of society by punishing and preventing crime on the one hand and saving the individual charged with crime from unjust conviction on the other."

These are axiomatic principles with which in the abstract no one would probably disagree; yet, if their application in the actual disposition of cases is forgotten, uncertainty, delay, and confusion in the administration of criminal justice must follow. The instant case illustrates, I think, a tendency in this court not to

give them proper heed. There has been no violation of any positive rule of law; but the majority of this court think that the trial court did not give the accused a "fair trial" and the State's Attorney argued the case "unfairly," hence it must be retried more to this court's liking. I submit that that is no adequate ground of reversal.