STATE, Plaintiff-Appellee, v VIOLA, Defendant-Appellant.

Ohio Appeals, Seventh District, Trumbull County.

No. 1147. Decided June 6, 1947.

578

Paul J. Reagen, Pros. Atty., William M. McLain, First Asst. Pros. Atty., Warren, for plaintiff-appellee.

Charles J. Margiotti, Pittsburgh, and W. W. Pierson, Warren, for defendant-appellant.

## OPINION

By PHILLIPS, J.

Defendant, Thomas Viola, was indicted by the grand jury of Trumbull County on the fourteenth day of February, 1944, for the murder of James Mancini upon an indictment laid under §12400 GC, which provides:—

"Murder in the first degree. Whoever, purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating or attempting to perpetrate rape, arson, robbery or burglary, kills another is guilty of murder in the first degree and shall be punished by death unless the jury trying the accused recommend mercy, in which case the punishment shall be imprisonment in the penitentiary during life."

A jury in the court of common pleas of that county found defendant guilty, of murder in the first degree, recommended mercy, and a life sentence was imposed. Defendant appealed from that judgment on questions of law.

Reference will be made to the parties here as they stood there, the State of Ohio as the State and\ Viola as Defendant.

James Mancini was shot "through the heart" about 9:30 o'clock on the night of March 24, 1941, in the barroom of the Prime Steak House, situated in Warren, Ohio, and, as the coroner of Trumbull County testified, died of "internal hemorrhages from" such "bullet wound".

Defendant was apprehended by the Federal Bureau of Investigation on August 8, 1945, in Tucson, Arizona, where there is evidence he went to benefit his health, impaired by "gonorrheal arthritis", "gastric ulcer and hypertrophy of the pyloric muscle" from which he was suffering, and was arrested on a warrant charging unlawful flight to avoid prosecution, issued upon information furnished by a sergeant of the police

department of Warren, Ohio, who was confidentially informed he had killed Mancini.

Mancini's son testified that he met Viola face to face just outside the Prime Steak House shortly after his father was killed, at a place which was lighted brightly; and he and two other eye witnesses to Mancini's murder identified defendant upon trial in the common pleas court as his murderer; and one of the state's witnesses testified defendant "was still pumping shots into him" after Mancini was shot three times.

A latent finger print of a left index finger found on a drinking glass identified as used by defendant just before Mancini was shot, which was in size "about half of a penny" and represented "at least eighty percent" of the finger print of the owner and one "almost the size of a quarter" found on another glass, and those of the bar tender on duty at that time were compared by the Federal Bureau of Investigation and found to be identical with those of the defendant and bartender.

Defendant did not testify in the court of common pleas, but there is evidence he had admitted previously that he had been "tipped off" that the hotel in which he was in Tucson, when apprehended and arrested, was surrounded by agents of the Federal Bureau of Investigation, one of whom he recognized, who testified in the trial court that while leaving such hotel, upon seeing him and the other agents and officers, defendant attempted to flee.

Two of defendant's witnesses, one an admitted "numbers operator" and the other a confessed "gambler" ("that is my business"), one of whom stated after the shooting he couldn't identify anyone, and the other that he couldn't identify the defendant or the other man who was with him when he entered the Prime Steak House, testified that they "didn't see much of anything", "didn't pay any attention to the killers", except that they ordered "Haig and Haig", and that "defendant was not one of the two men".

The bartender, who served defendant, and whose fingerprints were found on the drinking glass on which the print of defendant's left index finger was likewise found, testified for defendant that he was "positively not" the man who killed Mancini.

One of defendant's witnesses testified he couldn't identify anyone except Mancini's son as present in the Prime Steak House when the person, or persons, who shot his father were fleeing.

Another of defendant's witnesses testified that she did not recall seeing any person in the barroom when Mancini was shot, except "Mr. Huffman" with whom she was talking.

A third defense witness, who said he was a fingerprint, handwriting and firearms identification expert, and who admitted on cross-examination he was found guilty on twelve counts of inefficiency by the Civil Service Commission of Houston, Texas, and discharged from the police force of that city for that reason, testified he could not establish a positive identification between the ink print of defendant's left index finger and the latent print on the glass because the latter was not sufficiently clear. However he did not testify that in his opinion the two prints were not the same.

Briefly such is the evidence upon which the case proceeded to trial in the court of common pleas to which, together with the other testimony and evidence introduced there, reference will be made in detail in disposing of the numerous assigned grounds of error.

The trial judge did not err to defendant's prejudice in refusing to strike from the record the testimony of the agent of the Federal Bureau of Investigation, to whose testimony reference has been made, relative to defendant's attempted flight at the time he was apprehended in Tucson, Arizona, where he was known as Sam Lavigne; nor in striking from the record the cross-examination of one of defendant's witnesses relative to defendant's residence, employment and relationship to and association with certain persons of uncertain occupations; nor "in permitting the state's cross-examination of the defendant's witness Sailor relative to defendant's residence and employment and to his relation to Jake Lerner and Lieutenant Syracuse"; on the urged grounds that there is no evidence indicating defendant's attempt to flee from the arresting officers, and on the ground that his association with such persons had no bearing on the case, and that the most the state could show was "not that Viola had committed any offenses during his residence in Tucson, Arizona, but might have committed some offenses."

There is properly admitted evidence in the record that as defendant, together with a party of friends, left the hotel where he was apprehended and arrested at about 1:15 o'clock on the morning of his arrest, he walked to the west door of the hotel, saw the armed officers standing outside, and then immediately ran or walked hurriedly through the lobby of the hotel to the north door thereof, where he was arrested. Testimony or evidence of flight, resistance to arrest, concealment of identity, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt. See Wigmore on Evidence, Volume 2, Topics 273 and 276, pages 106, et seq., and cases cited thereunder.

While we find no error prejudicial to defendant in this assigned ground of error we cannot, and do not, condone trying cases by innuendo by asking questions of which there is no direct proof.

Federal Bureau of Investigation agent Latona, who qualified as an expert in finger print comparison, and to whose testimony reference is made heretofore, in testifying with reference to the fingerprint on the drinking glass compared by him being identical with the ink fingerprint of defendant said:—

"* * * I arrived at the conclusion that the finger which made the impressions appearing on State's Exhibit A-3 encircled in blue with a check mark, and also same finger which made the finger impressions appearing on State's Exhibit 'S' and the impression which is designated as 7 the index finger, and no other finger made the impression or could have made it."

Counsel for defendant contend that such testimony was testimony of an ultimate fact, and that the trial judge erred in permitting witness Latona to thus testify.

It is clear to us that in testifying thus witness Latona was merely stating his opinion, and not testifying to the ultimate fact of the guilt or innocence of defendant. It is observed that no objection was made nor saved to such claimed incompetent testimony.

Counsel for defendant contends that the admission of State's witness Latona that the Federal Bureau of Investigation "in my opinion * * * is recognized as being the world's authority on prints" constituted prejudicial error for the reason that "this question was not in issue and placed upon defendant the impossible burden of proving that the F. B. I. erred in identifying the latent and ink prints."

Witness Latona qualified as an expert of many years experience in fingerprint comparison, and we believe no error prejudicial to defendant intervened in permitting him to testify that "in my opinion the Federal Bureau of Investigation is recognized as being the World's Authority on prints", from his experience with the Bureau for "fourteen years and three months".

The trial judge permitted defendant's witness Fournier to testify on cross-examination as to the circumstances surrounding defendant's departure from an apartment which he was occupying, after his conference with the Police Department of the City of Youngstown, Ohio, and in answer

to the question "would you say that these people moved out hurriedly or normally" to testify "they moved out, I would say, in a hurry".

We find no error intervened to the prejudice of defendant as claimed in any of the subdivisions of this assigned ground of error. .

As suggested heretofore, the evidence discloses that one of the drinking glasses admitted in evidence as State's Exhibits M and N bore the fingerprint marks of defendant and the bartender on duty at the Prime Steak House when Mancini was killed. There is evidence that an eye witness instantly took possession of the glasses "two shot glasses and two rinse glasses" after Mancini was killed, and gave them to a police officer of Warren, who immediately delivered them to a captain of the Police Department of that city (where State's Exhibit M "was dated 3/25/41"), who in turn delivered them to the Superintendent of the Bureau of Investigation of that department; that immediately upon receipt thereof the latter dusted such glasses for the purpose of preserving any fingerprints thereon, and thereafter lodged them with the Prosecuting Attorney of Trumbull County, Ohio, in whose possession after they had been examined by the Federal Bureau of Investigation in Washington, D. C., they remained until the time of trial in the court of common pleas.

Upon all the evidence properly submitted to the jury on this phase of this case we can not agree with the contention of defense counsel that "there was insufficient foundation for the admission into evidence" of such exhibits "for the purpose of the comparison of the latent prints thereon with the ink prints of the defendant", nor that "the court erred in admitting State's Exhibits A-4 and A-5, photographs of latent prints on Exhibits M and N, taken under Latona's direction." Further, it is observed that counsel for defendant did not object or except to the admission of the last named exhibits into evidence.

Defendant's counsel next contend that "the trial court erred in admitting Exhibits F and H, pictures of the body of the deceased, James Mancini, when the question of his death was undisputed, and the purpose of the introduction thereof was to prejudice the jurors against the accused"; and "in admitting state's Exhibit D, the clothing of James Mancini, and sending said clothing out to the jury together with the other exhibits, for the reason that said exhibit was inflammatory".

Photographs are always admissible for the purpose of illustration, and are not inadmissible merely because shocking, horrible or tending to arouse passion or prejudice. See

Underhill's Criminal Evidence, Fourth Edition, Page 161. The admission of Mancini's clothing was admissible for the purpose of showing how many bullets entered his body as shown by the bullet holes in such clothing. The record discloses that defense. counsel Margiotti interposed an objection to the introduction of the clothing in evidence, and made inquiry concerning "the purpose of offering the clothing", to which the prosecutor responded "to substantiate the bullet puncture through the coat and to substantiate the coroner's testimony"; and that thereupon defense counsel Margiotti said "if that's your purpose we have no objection".

In the next two subdivisions of assigned ground of error number two defense counsel contend that "the court erred in admitting state's exhibit 'R', a letter from the F. B. I., dated April 10, 1941, because it was introduced without the letter of transmittal mentioned therein", and "in admitting state's Exhibit 'U', a letter from J. Edgar Hoover of the Federal Bureau of Investigation to Chief Gillen, dated February 5, 1944, wherein Mr. Hoover, who was not a witness at the trial, stated in effect that the latent and ink fingerprints were identical", for the reasons that "it is a fundamental principle in criminal prosecutions that the accused has the right to meet the witnesses against him face to face".

In admitting State's Exhibit "R", which was also identified as defendant's Exhibit 2, the trial judge stated that he was admitting such exhibit in evidence because defense counsel Margiotti had not only had it marked as his Exhibit 2 but had read from it, and referred to it numerous times, which statement is supported by the record, and accordingly the contents of the letter having been placed before the jury by the act of defense counsel Margiotti himself he overruled the latter's objection to the introduction of such exhibit on that urged ground and because it was urged it was generally incompetent, irrelevant and immaterial. Basing our conclusions upon a careful reading of the record with reference to this assigned ground of error and an equally careful study of the law applicable thereto we can not say that the trial judge erred in admitting Exhibit "R" in evidence under such circumstances.

With reference to defendant's complaint concerning the admission of Exhibit "U" it is observed that defense counsel Margiotti requested the admission of this exhibit into evidence, and that in granting his request the trial judge said in substance that since both parties desired its admission in evidence he would admit such exhibit, and that Mr. Margiotti then said "then that is all right as long as we can agree".

In other words, the view the trial judge apparently took with reference to both of these letters was that where any writing had been partially read and offered in evidence, the jury, on demand of opposing party, became entitled to examine the entire writing. In that event it became proper for the jury to see and examine the entire document from which counsel had offered any substantial portion. See **17 O. Jur, Article 493, Page 600**; 10 R. C. L. Article 288, Page 1088; 20 American Jurisprudence, Article 914, Pages 770, 771. It appears to be the law that the rule announced in the foregoing authorities applies the same in criminal as in civil cases. See **Bevington v State, 2 Oh St 160**; 49 L. R. A. 542; State v Smith (La.), 81 Southern 320; State v Thomas, 156 S. E. 169 at 172.

Considering the record presented to us for review we conclude that the trial judge did not err in any of the respects or upon any of the grounds urged by counsel for defendant in this assigned ground of error.

Counsel for defendant next contend that the trial judge "erred in the exclusion of certain competent, relevant and material testimony" in seven specific instances, each of which we will dispose of separately.

It is claimed by the defendant that the trial judge should have compelled Sergeant Johnson to divulge, upon cross-examination by defendant's counsel, the name of his informant, whose information led to defendant's apprehension. Wigmore on Evidence, Volume 8, Paragraphs 2374, et seq., Pages 751, 752 and 756, to which counsel for the respective parties are respectfully referred, supports the court's ruling on that claimed error. We can think of no good reason why the arresting authority should be compelled to divulge the source of its information. To compel the arresting authority to do so would tend to cause persons possessing valuable information concerning crimes committed to conceal it from the proper authorities for fear of personal harm or unwanted publicity.

Counsel for defendant further contend that the trial judge erred in limiting the cross-examination of state's witness Latona, to whom reference has been made heretofore herein. Upon cross-examination of this witness defense counsel Margiotti insisted he assume that he made a mistake, "let's say there is a mistake in any one of those twelve points" of identification of defendant's fingerprint on the drinking glass, to which reference has been made already herein, which the witness refused to do by saying "I don't see how I could assume I have made a mistake". After an exhaustive cross-examination of this witness as shown by the record, and which

judging by the length thereof and the time it took to read his testimony must have consumed seven or eight hours, the trial judge limited cross-examination for the purpose of avoiding repetition and ruled:—

"This witness answered your question to the best of his ability, and I don't think that the Court is bound to order him to say something which he doesn't believe that he should say, so I think the question therefore has been answered."

We have read the cross-examination of witness Latona and arrived at the conclusion that the trial judge allowed counsel for defendant full and complete opportunity and time to examine him about anything and everything relative to his findings, and observe that after counsel for defendant had complained of the limited time allowed by the trial court for such cross-examination the trial judge allowed him to further cross-examine the witness exhaustively and at great length.

The next of the series of seven complaints with reference to the exclusion of competent evidence is that the trial judge erred "in excluding testimony by defendant's witness, Sailor, in denial of Tickle's testimony that Sailor was sitting in an automobile across from the Tucson Hotel".

Defense counsel Margiotti propounded the following question and the trial judge ruled on it as set forth herein:—

"Q. Now I propose to ask this witness (Sailor) this question: Mr. Tickel has testified that at the time Viola went toward the West door, was going toward the west door, he could see this witness in an automobile sitting in an automobile, and that he was not at the west door I now want to ask the witness whether he was in a car at that time.

"COURT: This is direct examination. You have no right to either lead the witness nor to repeat what any previous witness said or which you think he may have said in your direct questioning of any witness."

The trial judge did not err in thus ruling in the respects claimed in this subdivision of this assigned ground of error.

Counsel for defendant attempted to introduce testimony that he had cooperated with the Police Department of Tucson in preventing a jail break in that city while he was confined there awaiting extradition to Ohio, for the purpose of showing

his good character, and "that the defendant cooperated with the police authorities, and that he would not have been likely to have fled from the scene of a crime".

We agree with the statement made by counsel for the state by brief that "there is no rule of law by which a defendant on trial can, through witnesses, introduce good deeds of his life, which have no bearing on the case. This sort of testimony is limited entirely to a summation of the total character of the defendant and then through witnesses, who are in a position over a period of time, to have apprised themselves of the general conduct of defendant"; and hold that the trial judge did not err "in excluding testimony offered by defendant, that he had cooperated in the prevention of a jail break while he was in the Tucson Jail".

The trial judge refused to permit defense witness DiCenzo, who testified that defendant "wasn't the man" who killed Mancini, to answer the following question propounded to him on direct examination by defense counsel as to whether he had heard Mancini's son state that one of the two men who entered the barroom of the Prime Steak House just before Mancini was killed say to the other, "Tom, this way";—

"Q. Did you hear him say that night, or any other time thereafter, except here in Court, that he had heard one man say to the other one 'Tom, this way'."

Counsel for defendant contend this question "was competent, relevant and material", and that the trial judge erred in refusing to permit DiCenzo to answer it. We believe not.

Upon direct examination defendant's witnesses Rich and Bango attempted to testify that defense counsel Margiotti had conversed with Bernard Monfrino on October 8, 1945, with reference to Mancini's murder, which Monfrino denied, which testimony was offered for the alleged "purpose of contradicting Mr. Monfrino's testimony". The trial judge admitted the testimony of these witnesses concerning the occurrence of such conversation, but refused to permit them to testify concerning the nature of that conversation, which counsel for defendant dictated into the record. We believe that the trial judge erroneously refused to permit these witnesses to testify as to the nature of such conversation, but that considering all of the evidence in this case his refusal did not constitute error justifying a reversal of this case on that ground.

Lastly under the assigned ground of exclusion of claimed proper testimony or evidence counsel for defendant contend

that "the court erred, on direct examination of Dr. Hull and Dr. Jacob, optometrists, in excluding testimony relative to the condition of Bernard Monfrino's eyes, on the theory of privileged communication".

In a statement dictated into the record by defense counsel Margiotti it is apparent that he intended to show by the testimony of these witnesses that Bernard Monfrino wore bifocal glasses in 1935, ostensibly for the purpose of showing he could not see clearly on March 24, 1941, and that there was some evidence that when examined by witness Jacob in April, 1945, he was suffering from cataract, a recognized eye disease, which men of their profession are prohibited by statute from treating for the reason that their practice is limited by §1295-21 GC, to the examination of human eyes for the purpose of ascertaining departure from the normal measuring and functional powers.

The trial judge did not err in excluding the testimony of witnesses Hull and Jacob, though as claimed, but not determined by us, the reason assigned by him for excluding might have been founded upon an improper basis. Testimony as to the condition of Monfrino's eyes as revealed by an examination made by witness Jacob in April, 1945, probably would not reflect the condition of his eyes on March 24, 1941, and for that reason alone would not be admissible. Such testimony was too remote to be valuable in this case.

If optometrist witnesses are held to be physicians and competent to testify concerning disease, if any, of Monfrino's eyes or eye, certainly the confidential relationship existing between Monfrino, who did not give the witnesses permission to testify concerning such condition, and witnesses Hull and Jacob are and should be protected by the provisions of §11494 GC, which prohibit them from disclosing communications or facts relating to the condition of his eyes without his consent.

In assigned ground of error number four counsel for defendant contend that the trial judge "erred in the exclusion of certain exhibits offered in behalf of the defendant, that were competent, relevant and material;" "in excluding from evidence defendant's Exhibit No. 10, 1937 F. B. I. Bulletin on Finger Prints"; and "in refusing to admit into evidence a certified copy of the record of the reversal of the conviction of defendant of the offense of counterfeiting".

Defendant's excluded Exhibit No. 10 is an informative pamphlet on fingerprints and fingerprinting generally, excerpts from which were read to the jury, and which was offered by defense counsel for the purpose of refuting the

testimony of state witness Latona, who explained that the rule laid down therein nine years ago by Dr. Locard, an early French fingerprint authority, that twelve identical points were necessary in the comparison of latent and ink prints was not longer followed by the Federal Bureau of Investigation; and testified "today there's no rule or policy in the F. B. I. to the effect that it takes twelve points or any specific number of points to make an identification", as the science of finger-printing and comparison had developed during that period, and other factors had become of dominant importance.

Witness Latona did not deny the existence of such a pamphlet nor the contents thereof, and testified, from state's Exhibit A-6, that there were twelve points of similarity be-tween defendant's left index finger and those found on a drinking glass submitted to the Federal Bureau of Investiga-tion for comparison, and that there were several other points of similarity which he did not deem it necessary to chart; and on cross-examination testified that "there were seven" "points of comparison" on the smaller glass, which were a sufficient number for identification as he "felt twelve would be sufficient for the purpose of demonstration".

As a result of a careful study of this subdivision of the assigned ground of error under discussion, we conclude that the trial judge did not commit prejudicial nor reversible error in excluding the proffered exhibit on the ground that it did not refute anything and that by its exclusion "the only impression left from reading the testimony of Latona is that there was only one method of comparing prints, and that was the one he used in making the comparison for the purpose of this trial", and that defendant was not "deprived of a fair trial".

The trial judge admitted into evidence State's Exhibit A-3, an identification card of the ink fingerprints of defendant made in 1934, at a time when he was prosecuted for and convicted in the United States District Court of Michigan of the offense of counterfeiting, for the purpose of showing that defendant's fingerprints were in the general fingerprint file of the Federal Bureau of Investigation in Washington, D. C., where no single print file is kept of any person or persons except those convicted of bank robbery, extortion or kidnaping.

The conviction record of defendant on the counterfeiting charge and confidential data to the Department of Justice, placed thereon while it was in the master file of the Fed-eral Bureau of Investigation appeared on the opposite side of that card, which record was concealed by a piece of white paper firmly sealed thereto, for the reason that the conviction of the offense of counterfeiting and the reversal thereof were

in no way connected with the crime for which defendant was being tried in the trial court, and accordingly properly not admissible in evidence.

The bill of exceptions discloses that defense counsel Margiotti insisted that the paper be removed from the record side of the fingerprint identification card, and the record thereon disclosed, and that he removed it thereafter, and stated to the jury that defendant's conviction on the charge of counterfeiting had been reversed, and there is no evidence of other reference made thereto during trial, either in an attempt to introduce evidence in support thereof or by argument of counsel.

The trial judge refused to admit defendant's Exhibit 30, a certified copy of the record of the United States District Court of Michigan and the opinion of the United States Circuit Court of Appeals of the same state reversing defendant's conviction on the charge of counterfeiting, offered for the purpose of refuting evidence of his conviction thereof, on evidence of such conviction, offered by the state, to refute.

We cannot agree with the contention of defense counsel that "the state having introduced into evidence Exhibit A-3 in the shape in which it was at the time, with the reverse side covered with a white sheet of paper, was not affording the defendant a fair trial"; nor that state's exhibit was only introduced for the purpose "to prejudice the accused", and "served no additional purpose", or was admissible for the purposes of showing why he had been known under assumed names, or was improperly charged with the commission of crime; or that the court committed prejudicial error in admitting State's Exhibit A-3 when State's Exhibit S, which contained defendant's fingerprints, was already in evidence.

Though submitting to the jury some special requests to charge before argument tendered on behalf of the defendant the trial judge refused to submit to the jury nine others in which he was asked to charge the jury, "that no class of testimony is more uncertain and less to be relied upon than that of identity evidence"; that "one of the most difficult problems of the administration of justice deals with that of identity of a defendant"; that "the jury cannot find defendant guilty of any crime merely upon suspicion"; that "opinion testimony of fingerprint experts as to the correspondence of fingerprints is not sufficient basis for a conviction"; that the "jury was not required to find in accordance with the opinion of the state's expert witness Latona"; that "the jury must receive the testimony of expert witnesses with great caution"; that "opinion evidence of experts is of a lower grade"; that "the

jury might refuse to believe the testimony of Latona"; that "defendant had offered evidence of good character for peace and quiet, and that it was the jury's duty to acquit him if after consideration of all the evidence in the case, including the character evidence, it entertained a reasonable doubt as to his guilt"; and that "the state had failed to prove any motive for the crime and as to the effect of the absence of motive".

It was the jury's duty to consider all the evidence and place the value it desired upon any of the evidence or exhibits submitted to it, and its right to believe or disbelieve any witness it heard. The trial judge had no duty nor right to comment upon any of the evidence nor suggest to the jury the weight it should give to any particular evidence submitted to it, nor discount any such evidence, nor suggest nor indicate to the jury in any manner what testimony it should consider, nor what testimony was not worthy of their belief, nor charge the jury nor even suggest to it that it must receive the testimony of expert witnesses with great caution, nor that opinion evidence of experts is of lower grade as he was asked to charge the jury in some of defendant's special requests to charge (numbers 1, 2, 3, 9, 10, 11, 12, and 13). In his general charge to the jury the trial judge fully covered the propositions of law which he was asked to submit to the jury in the special requests to charge (numbers 9, 13 and 16) which he refused to submit to the jury.

The trial judge was under no duty, and had no right, to emphasize testimony relative to defendant's character, good or otherwise, more than above stated he had any right to emphasize any other testimony or evidence submitted to it, which disposes of defendant's request to charge number 14.

While motive is not a necessary element of any crime, and the state was not required "to prove any motive" of defendant "for the crime", nevertheless the trial judge charged the law applicable to the question of motive or absence of motive in his general charge fully, and properly charged the jury that the presence or absence of motive is a circumstance to be considered with all the other evidence and facts submitted to it in determining whether defendant was guilty of the commission of the crime with which he was charged.

We are aware of the provisions of subdivision 5 of §13442-8 GC, that "when evidence is concluded, either party may request instructions to the jury on the points of law, which instructions shall be reduced to writing if either party request it"; but concur in the reasoning of the court in the case of Kahoun v State, 33 Oh Ap 1, 168 N. E. 550, that the "trial court's refusal of special requests for charge on

part of defendant, where request was made at conclusion of evidence, was discretionary under" former §13675(5) GC; and that "the court may in the exercise of its discretion in a criminal case give one or more special charges requested by counsel before argument, and refuse others", **O'Mara v State, 16 Oh Ap 62;** and further that the provisions of this section "are discretionary and not mandatory" as held in **State v Weger, 25 Abs 49.**

"Sec 13675 GC, authorizes, but does not require, the trial court to charge the jury at the conclusion of all the evidence and before argument upon points of law applicable to the case requested by the state or the accused, and the refusal to so charge does not constitute error." **Maranda v State, 17 Oh Ap 479.**

"Court is not required to give special instructions in criminal cases before argument." **Hornsby v State, 29 Oh Ap 495, 163 N. E. 923.**

"While the legislative intent is not clear, this court, in **Blackburn v The State of Ohio, 23 Oh St, 146,** held that the court is not bound to deliver such charge until after the argument. We are inclined, to the end that the uncertainty as to its meaning be settled, to interpret it farther and are of opinion that in the trial of criminal cases the statute authorizes but does not require the giving of a proper charge before argument upon the request of counsel for either party as to the point requested, and so hold." **Wertenberger v State, 99 Oh St, 353, 124 N. E. 243.**

"It has been settled by this court in the case of **Wertenberger v State, 99 Oh St, 353, 124 N. E., 243,** that under §13675, GC, it is not mandatory upon the court to give any instructions to the jury in a criminal case before argument. This declaration has never been overruled and this court is at this time in full accord with it. That case did not decide, nor has any other case decided by this court declared, that a request made before argument may be ignored in the general charge. Neither has it ever been declared that it is necessary that the request be renewed after argument." **Grossweiler v State, 113 Oh St, 26 at 48.**

"The court is not required to give special charges before argument in a criminal case." **Balzhiser v State, 35 Abs 120, 121.**

"Trial judge in criminal cases is not required to give requested written instructions in advance of argument, nor to incorporate them literally in general charge." **Briseno v State, 36 Oh Ap 459**, 173 N. E. 617.

We conclude that the trial judge did not commit error prejudicial to defendant in refusing to submit to the jury the special requests to charge before argument tendered by defendant and rejected by him.

The trial judge sustained the defendant's objection to the state's testimony that Mrs. Vincent was in fact Mrs. Monazum, proffered for the purpose of contradicting testimony of the defendant's witness that a photograph, State's Exhibit A-7, was Mrs. Vincent when in fact it was Mrs. Monazum. In sustaining such objection the trial judge stated that he could not recall what testimony was introduced with reference thereto and told the jury it was its duty to remember whether the testimony to which reference was made was in the record.

In his argument to the jury, one of counsel for the state referred to Mrs. Vincent as Mrs. Charles Monazum, which reference counsel for defendant claims constituted misconduct of State's counsel and resulted in prejudice to the defendant necessitating this court reversing the judgment of the trial court.

We have read the record with reference to what transpired and the remarks of counsel of which complaint is made, and it is clear to us that counsel for the state had no intention to prejudice the rights of defendant in any way by referring to Mrs. Vincent as Mrs. Charles Monazum, her correct name, and conclude that such inadvertent reference was of such a minor nature as not necessarily or probably to mislead the jury to the prejudice of defendant.

There is evidence that defense counsel, Margiotti referred to state's witness Latona as a "superman" during trial, and on one occasion said "it amounts to saying 'I'm perfect and nobody dares say that I am not perfect.' That's what it amounts to. It amounts to a 'superman'".

Again during argument to the jury one of counsel for the state said:—

"Now, you have, for seven long hours, had an opportunity to observe Latona on the stand under cross examination; and I don't believe he uttered one word that was not true. His testimony was not in any way, to my way of thinking, discredited; and if we aren't going to believe the Federal Bureau

of Investigation in matter of identification of fingerprints, who are we going to believe; and I resent anyone ridiculing that organization, because they have certainly done an outstanding job in this war, in protecting us, and are doing it today in the matter of criminal identification."

Counsel for defendant contend that the stated portion of State's counsel's argument was improper and deprived defendant of a fair trial. The argument of counsel for defendant is not before us, and since the claimed offending counsel states by brief that the quoted portion of his argument was made in answer to the argument of defense counsel we cannot ascertain that, and will not disturb the verdict of the jury on this ground. In any event, we believe that defendant's guilt was established beyond any reasonable doubt, and that the argument of state's counsel under discussion was so inconsequential as not to have influenced the jury to defendant's prejudice. See §13449-5 GC; **State of Ohio, Appellant v Witsel, Appellee, 144 Oh St 190.**

The third complaint made by defense counsel under this assigned ground of error is that during his closing argument one of counsel for the state said to the jury that it might recommend mercy even though it found defendant guilty of first degree murder, and contends that "although no objection was taken by the defendant, at the time when it was made, the remark was so flagrantly unjust and improper as to require a verdict obtained by such statement to be set aside on a motion for a new trial."

Of course, it was the duty of defense counsel to protect the record they were making, and there is nothing before us which convinces us that a verdict against defendant was "obtained by such statement", making it mandatory for the trial judge to set the verdict "aside on motion for a new trial".

In a capital case the jury has a duty to consider the punishment in the event of first degree murder, and it is believed, that in this case, the argument of counsel, of which complaint is made, did not prejudice defendant's rights nor deprive him of a fair and impartial trial. See 53 American Jurisprudence, Volume 53, Page 373, Section 467. Also see §13442-9 GC.

Defense counsel filed notice of alibi but did not state therein the place where defendant claimed to be at the time the crime, with which he was charged and for which he was convicted, was committed, and as far as we can ascertain from the bill of exceptions introduced no evidence indicating that he was at some other place, or at any particular place, at

such time, except that he was living in Youngstown and was in and about Youngstown at or about that time, which in our opinion does not constitute evidence of alibi. During argument on the state's motion to "make the alibi more definite and certain" defense counsel Margiotti said "all we can do is say he was in Youngstown and that he was at a particular place at the time this alleged crime was committed is humanly impossible".

In accordance with the provisions of §13442-9 GC, in our opinion the trial judge stated all matters of law necessary for the information of the jury in giving its verdict, and informed the jury that it was the exclusive judge of all questions of fact; but did not charge the jury on the defense of alibi, which counsel for defense claims rendered the general charge of the trial judge prejudicially erroneous.

We have read and examined the general charge with care, and we cannot quote therefrom further and hope to keep the length of this opinion within reasonable bounds. Further, we believe no useful purpose would be served by doing so. Accordingly, we content ourselves with saying that we conclude that the trial judge did not err "prejudicially" in his "general charge to the jury" in the respects charged by defense counsel. In addition, this matter is one of omission, and it becomes the duty of defendant's counsel to call the attention of the trial court to such omission.

During deliberation the jury requested the trial judge in writing to instruct it further whether "the State's Exhibit A-6" was "evidence or comparison", and whether it "should * * * have evidence of the coroner's inquest". The trial judge conferred with counsel for the respective parties late in the evening of the day when such requests were made, during which it was agreed that the jury should be instructed that it should not "have evidence of the coroner's inquest". The trial judge refused defense counsel's request to instruct the jury that State's Exhibit A-6 should be compared, or that the jury could compare it; but by agreement of counsel instructed the jury as hereinafter set forth that such exhibit was evidence which it could consider together with all the evidence in the case, and in that respect complied with the request of defense counsel. In the absence of the court reporter the trial judge, with the consent of defense counsel, wrote and sent such instructions to the jury without the presence of defendant, who was in the county jail.

Fearful lest defense counsel was powerless to waive the right of defendant to be present when the jury was thus instructed, immediately after sending the stated written

instructions to the jury room, the trial judge called the jury into open court, had them seated in the jury box, and in the presence of the defendant, his counsel, the prosecutor, and the court reporter instructed the jury as he had in his written instructions sent to the jury room.

Defense counsel made no objection to that procedure, but now contend that "the court erred in giving additional instructions to the jury", and cite authorities to support their contention "that the accused herein had a right to be present at all times during the course of the trial when anything was said or done affecting him, and that the giving of additional instructions in his absence was a violation of this right, affording a ground for new trial"; and that "the giving of these instructions in the absence of the defendant was a violation of his privilege to be present at every stage of the trial"; and urges it must be "presumed that he was prejudiced by the giving of the instructions on the first occasion in his absence"; and that the trial judge erred in his instructions.

The fundamental purpose of the presence of the defendant in court is to object to anything he considers erroneous or detrimental to his rights as an accused.

"The test to be applied, in determining whether statute providing that a person tried for felony shall be personally present during the trial has been violated, is whether the interest of defendant has been affected by the action of the court in defendant's absence." Rogers v Commonwealth, 31 S. E. (2nd) 576, syllabus 1.

In the case of Edmonds v Commonwealth (Court of Appeals of Kentucky), 264 Southwestern Reporter 1100, it appeared that during the progress of the trial "a recess was taken that the court might have time to prepare its instructions, and during the recess the appellant was remanded to jail. After the recess the court read to the jury the instructions that had been prepared, and the attorneys for the defense began their argument, before it was discovered that the appellant was not in court. The court stopped the proceedings immediately, had the appellant brought into court, and then started to reinstruct the jury. The appellant's counsel, in his presence, waived this, and continued with the argument. It is now insisted that by this the appellant was deprived of one of the rights guaranteed him by section 11 of the Constitution."

In that case it was held "accused's counsel could then in accused's presence waive reinstruction to jury; no constitutional right being thereby waived."

"Where verdict of guilty was received in accused's absence, but jury was kept intact until accused was brought into court, and verdict was read again in his presence, accused's constitutional right to be present during trial was not violated." Morris v State, 170 S. E. 217.

"Where verdict of manslaughter was inadvertently read and jury were polled (as was done in the instant case) by defendant's attorneys in defendant's absence, but within a few minutes defendant's presence was procured, jury were reassumbled, and same verdict, without further consideration by jury, was read and jury were polled, defendant's substantial rights held not prejudiced." Gray v Commonwealth, 70 S. W. (2nd) 970.

"It is not error for the trial court, in a capital case, to re-read to the jury a portion of the testimony and of the charge in the temporary absence of the defendant but in the presence of defendant's counsel, at the request of the jury; no step original in its character being taken." State v Nardella, 154 Atl. 834.

In this case we believe counsel for defendant and defendant waived reinstruction to the jury during which time both were present by failing to object, and under the law and the evidence in this case defense counsel by his action in consenting that the trial judge should send instructions to the jury in the first instance, and failing to object to his reinstructing it in open court thereafter, waived any error that might have been committed in the first instance, and that "no constitutional right" of defendant was waived by any of the named acts of his counsel or omissions to act on their part.

Considering the evidence in this case in its entirety, and that with respect to the assigned ground of error under discussion specifically, and the authorities we have cited we reach the conclusion that the interest of the defendant was not prejudicially affected by what the court did during defendant's absence as hereinbefore set forth herein. If the trial judge erred in refusing to properly instruct the jury, as defense counsel contend he did, it was their duty to object, which as stated they failed to do.

The question presented by this assignment of error is troublesome, and we are aware it is a borderline question, but we are persuaded that the great weight of authority supports

the conclusion we reach with respect thereto, which of course is based solely upon the facts in this case as disclosed by record submitted to us.

Finally we come to consider and dispose of defendant's ninth and last assigned ground of error, which together with subdivisions total thirty-six errors complained of, which last claimed error is that the verdict of the jury and judgment of the trial judge entered thereon are against the manifest weight of the evidence. The 1513 page bill of exceptions submitted to us for review has been read carefully, the evidence weighed and measured with care, the numerous exhibits attached thereto studied painstakingly, and the entire bill of exceptions scrutinized and considered, and the conclusion reached that considering the damaging evidence properly admitted against defendant in the trial of this case the verdict of the jury and judgment of the trial judge entered thereon are certainly not against the manifest weight of the evidence.

We learn from the transcript of the docket and journal entries that the trial was called and commenced in the court of common pleas on the twenty-fifth day of March, 1946, and that the case was submitted to the jury and it returned its verdict on the eighth day of April following. The bill of exceptions is voluminous, the objections unusually numerous and technical in nature, and the case an exceptionally long, hard fought and ardently tried one. After careful consideration of the record, the contentions of the respective parties and all papers submitted to us it is difficult to conceive how this case could have been tried without the intervention of some error. However as the result of the stated careful consideration of this case in its entirety we conclude that any such error was not prejudicial in nature, and that defendant's guilt was established beyond a reasonable doubt regardless of any error that might have intervened; and can not say that it affirmatively appears from the record that defendant was prejudiced thereby, or was prevented from having a fair trial, and under "the circumstances this court can not hold that substantial justice has not been done." See §13449-5 GC. See also State v Jones, et al, 145 Oh St 136 at 143.

The judgment of the court of common pleas is affirmed.

CARTER, PJ, NICHOLAS, J., concur in judgment.