## STATE OF CONNECTICUT *v.* WALLACE M. WALTERS

WYNNE, C. J., BALDWIN, DALY, KING and MURPHY, Js.

Argued January 8—decided January 28, 1958

*Raymond W. Ganim* and *Samuel S. Freedman,* for the appellant (defendant).

*Lorin W. Willis,* state's attorney, with whom, on the brief, was *Otto J. Saur,* assistant state's attorney, for the appellee (state).

KING, J. The accused was convicted of murder in the first degree committed in the perpetration of a robbery upon the decedent, Dorothy E. Cahill. The verdict contained a recommendation, under the provisions of § 3266d of the 1955 Cumulative Supplement to the General Statutes, that the punishment should be imprisonment for life.

The assignments of error pressed in the brief cover certain instructions supplemental to the basic charge, certain rulings on evidence and a claim that the foregoing statute is unconstitutional.

The basic charge, to which no exceptions were taken, was completed about 3 p.m. on June 12, 1956, and the jury deliberated until 10 o'clock that evening, when they were excused to go home for the night. The next morning they resumed deliberations, which were continued, except for the luncheon recess, until 5 o'clock in the afternoon, when the foreman reported that they were "in hopeless disagreement." In response to an inquiry from the court as to whether the disagreement was "of such a nature that you cannot under any circumstances resolve it," the foreman replied that "the jury is in the same position right now as we were, roughly, about this time yesterday." The court stated that it was going to ask them to give the case "some further consideration," but that it would excuse them until the next morning.

At 10 o'clock the next morning the court gave the jury, almost verbatim, a portion of the charge ap-

proved in *State* v. *Smith,* 49 Conn. 376, 386, a charge originally approved by the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Tuey,* 62 Mass. (8 Cush.) 1, 3. Thereupon they retired. Counsel for the accused excepted to the court's failure to give the complete charge as approved in *State* v. *Smith* and also asked that "this jury be dismissed" on the ground that the foreman had reported that they were in hopeless disagreement and had not made any progress in more than a day's deliberations. The motion to dismiss was denied, and to this ruling the accused excepted. The court did recall the jury, however, at 10:23 a.m. and not only gave them the omitted portion of the charge approved in *State* v. *Smith* but emphasized that the rule enunciated in the charge applied whether the majority were for conviction or for acquittal and that the court was in no way intimating what result the jury should reach. At 10:25 a.m. the jury again retired, and at 12:05 p.m. reported that they had agreed upon a verdict. Whatever we might have thought had the court failed to respond to the accused's request that the entire charge as approved in *State* v. *Smith* be given, the court's prompt action in recalling the jury within eight minutes for the sole purpose of correcting the oversight eliminated any possible harm which could have flowed from it. The very fact that the jury were recalled for this single reason favored the accused, if anything, because the importance of the added charge was unduly emphasized. *Laffin* v. *Apalucci,* 128 Conn. 654, 658, 25 A.2d 60. It was not until after an hour and a half of further deliberation, subsequent to the correction of the charge, that the jury reached a verdict.

The attack on the charge from *State* v. *Smith* on the ground that it amounted to a direction that the

verdict be whatever a majority of the jurors thought is without semblance of merit. The accuracy of the charge as a statement of the jurors' duty is not open to question. Its use has been approved by the Supreme Court of the United States. *Allen* v. *United States,* 164 U.S. 492, 501, 17 S. Ct. 154, 41 L. Ed. 528. Better than any other statement which has come to our attention it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors, something without which no intelligent body of twelve would be likely to reach a unanimous result in any case where there was any substantial factual dispute. *Allen* v. *United States,* supra. For practical reasons only, its use has customarily been deferred until after a disagreement has been reported. *State* v. *Schleifer,* 102 Conn. 708, 725, 130 A. 184. But after the foreman reported the disagreement the situation confronting the court practically required the giving of the charge. *State* v. *Wyman,* 118 Conn. 501, 506, 173 A. 155; *State* v. *Bradley,* 134 Conn. 102, 112, 55 A.2d 114.

The claim that the court should have dismissed the jury without more as soon as the foreman reported the "hopeless disagreement" was not made, as it should have been, at the time, but was deferred until the following morning after the court had given the first portion of the charge from *State* v. *Smith.* However, since this is a capital case, we overlook this technical infirmity in the claim. On the merits it was not an abuse of discretion for the court to give the charge from *State* v. *Smith* instead of treating the jury's first report of a failure to reach a verdict as a final disagreement warranting an abandonment of the trial. *Dutton* v. *Tracy,* 4 Conn.

79, 93; *State* v. *Mosca,* 90 Conn. 381, 385, 97 A. 340.

One other matter, obviously an afterthought on the part of counsel for the accused, we consider only because this is a capital case and we allow no technicality to interfere with the right of an accused to a fair trial in strict conformity with the fundamental requirements of due process of law. It concerns a portion of the supplemental charge given just before the adjournment of court on Wednesday, June 13, 1956, immediately after the foreman had reported that the jury were in hopeless disagreement. This was not at any time excepted to by counsel for the accused, and the court was consequently given no hint that any complaint was to be made about it, nor was the court given any opportunity to modify or correct it. The instruction now complained of was, in effect, that the case had taken a great deal of time and effort on the part of all concerned, including the jury, a verdict would save a tremendous amount of expense and energy in a retrial, and for that reason the court was going to ask the jury to deliberate further but would excuse them until the next morning, since they had had a long day. Of course a jury must not be coerced into unanimous action on the ground of saving money for the state or, indeed, on any ground. However, followed as it was, upon the resumption of deliberations the next morning, by the approved charge from *State* v. *Smith,* clearly stating the jurors' duty, we can find no reason to believe that the accused was in any way harmed by the language now complained of.

The accused chose to, and did, take the stand in his own defense. By so doing, he subjected himself to cross-examination as would any other witness. In an attempt to attack his credibility, he was asked whether he had not made statements to his wife con-

trary to those made by him on the witness stand. His counsel objected, stating that "any conversation which took place with this man and his wife has nothing to do with this case . . . [a]ny more so than any conversation which took place between Mrs. Cahill [the decedent] and her husband." The state's attorney started to say, "Well, because of the fact that under the law I cannot compel her to testify ———" and was interrupted by counsel for the accused, who objected to any statements of law in the presence of the jury. The state's attorney then added, "I was almost through when he interrupted me. I was going to say in view of the law that a wife cannot be compelled to testify against her husband, but I will not press the question." Counsel for the accused then asked that "the remark be stricken from the record and the jury be instructed to ignore it." The court denied the request.

While the request might well have been granted, we fail to see how the accused was in any way harmed by its denial. General Statutes § 8800 clearly provides that an accused's wife, except in certain cases, such as those where she is the victim of personal violence at his hands, cannot be compelled, although she is permitted, to testify for or against him, and the accused quite properly makes no claim to the contrary. The statement of the state's attorney obviously was an explanation of why he happened to ask the question. It was not a statement of any material fact, as was the statement in *State* v. *Santello,* 120 Conn. 486, 490, 181 A. 335. A witness may always be asked about inconsistent statements. *Adams* v. *Herald Publishing Co.,* 82 Conn. 448, 452, 74 A. 755; *Fairbanks* v. *State,* 143 Conn. 653, 657, 124 A.2d 893. Here, because of the privilege accorded the accused's wife under § 8800, the state's attorney could not call

her to the stand and ask her about the accused's statements to her. This limitation on the state's attorney had, however, nothing to do with his right to cross-examine the accused as to inconsistent statements. See *State* v. *Hoyt,* 47 Conn. 518, 540. This right stemmed solely from the fact that the accused, having taken the stand, subjected himself to cross-examination as to credibility and as to matters relevant to his direct examination, as would any other witness. *State* v. *Fienberg,* 105 Conn. 115, 120, 134 A. 228; *State* v. *Palko,* 121 Conn. 669, 677, 186 A. 657. The net result of the whole matter was that an indisputably correct and harmless rule of law may have been heard by the jury and that counsel for the accused succeeded in dissuading the state's attorney from pressing a perfectly proper question in the cross-examination of the accused.

The defendant called as a witness Willie J. Miller, a bartender at a restaurant, and asked him if he had been under subpoena. He replied that he had been in court under subpoena since May 18, 1956. Counsel for the accused asked to see the subpoena and Miller handed it to him. He then asked the name of the authority issuing the subpoena and the witness in reply gave the name of the state's attorney. Counsel asked if the subpoena was issued by the state's attorney and the witness responded in the affirmative. The subpoena was then offered in evidence, but upon objection by the state it was excluded as "not material at this time." Since Miller had not been called to the stand by the state in its case in chief, the ruling certainly was not erroneous. This aside, however, no harm came from the exclusion of the subpoena, since all the material information which could have been gleaned from an inspection of it seems to have been brought before the jury. Technically, of course, the

failure of the accused to have the subpoena marked
as an exhibit for identification destroyed any right
to a review of the ruling excluding it and except for
the peculiar circumstances here present would have
precluded us from being able to make such a review.
*Thelin* v. *Downs,* 109 Conn. 662, 668, 145 A. 50; *Wolf-
pit-Villa Crest Assn., Inc.* v. *Zoning Commission,* 144
Conn. 560, 565, 135 A.2d 732.

Abraham Stolman, chief toxicologist for the state
of Connecticut, had testified without objection that
after tests he found that the decedent's blood was
type A and the accused's type B. Thereupon he
was shown a shirt of the accused and was asked if
he noticed certain stains or spots on it. He answered
that there were bloodstains on it and was interrupted
by counsel for the accused, who objected on the
ground that no testimony as to bloodstains on the
shirt was admissible. The court called a recess to en-
able counsel for the accused to find some support
for his claim. This search proved fruitless. *State* v.
*Rubaka,* 82 Conn. 59, 61, 72 A. 566. Quite properly
the objection was withdrawn. It was renewed, how-
ever, when, after a full foundation had been laid, in-
cluding the fact that the stains were human blood,
the witness was asked what type of human blood was
found on the shirt. Counsel for the accused then ob-
jected. In response to the court's request that he
state the ground of the objection, he replied: "The
type of blood can be used for the purpose of proving
the innocence of the accused, but not for the purpose
of attempting to prove the guilt of the accused." The
court properly overruled the objection. Indeed, the
accused's claim hardly merits discussion.

On the assumption that it is correct, as brought
out by the accused, that type A blood is possessed by
40 per cent of the population of the United States

and that Mrs. Cahill's blood was type A, testimony that the bloodstains on the accused's shirt were of type A was admissible as a step in linking the accused with the crime, even though the testimony was wholly inadequate, in and of itself, to identify the accused as the one committing the homicide. Testimony as to physical characteristics such as height, weight and footprints is far from conclusive on a question of identification, since a multitude of persons other than a given accused possess these characteristics in forms substantially the same as his. Yet it has never been claimed that such evidence is not admissible. It is not any one fact, but the cumulative impact of a multitude of facts, which establishes guilt in a case, such as this, where there are no eyewitnesses to the crime. Criminal cases from other jurisdictions in which evidence of blood types has been admitted on the question of identity are collected in annotations in 163 A.L.R. 939, 952, and 46 A.L.R.2d 1000, 1037. And of course had Mrs. Cahill possessed a type of blood differing from that of the bloodstains on the accused's shirt, that evidence would have been of great benefit to the accused. In this case the evidence was of more than ordinary value, since the accused himself had claimed that in the early evening of the alleged murder he had cut his finger in defending himself against a knife attack by a man named Tookes, and that a little later he had fought a Puerto Rican whose head was bandaged. While the accused did not admit that he had worn the shirt on the night in question, he obviously gave this testimony in an effort to account for the presence of the bloodstains in the event that the jury believed the state's evidence that he had worn the shirt at the time of the murder. Not only the state but the accused himself claimed to have proved that Mrs. Ca-

hill's blood was classified as type A. If the jury believed that it was type A and also that the accused's blood was type B, then the finger cutting explanation of blood on the shirt would be weakened, if not destroyed. The ruling was correct.

As previously noted, no objection or exception whatever was made to the basic charge. Sometime after rendition of the verdict of guilty of murder in the first degree with a recommendation that the punishment be life imprisonment, the accused for the first time made the claim that § 3266d[1] (now Public Acts 1957, No. 461, § 3) which was in effect at the time of trial and authorized the jury's action, was unconstitutional for two main reasons: first, that it denied the accused the equal protection of the laws, and second, that it deprived him of due process of law.

It is the claim of the accused that but for § 3266d the jury could not have ordered a penalty of life imprisonment and he would have received a mandatory death sentence and that he might then have secured a commutation to life imprisonment from the board of pardons, in which case he would become eligible for parole, after somewhat less than twenty-five years of

---

[1] "Sec. 3266d.  HOMICIDE; PENALTY OF DEATH OR LIFE IMPRISONMENT.  Any person who shall commit murder in the first degree, or who shall cause the death of another by wilfully placing any obstruction upon any railroad or by loosening, taking up or removing any part of the superstructure of such railroad or by wilfully burning any building or vessel, shall suffer death unless the jury shall, by its verdict and as a part thereof, upon and after a consideration of all the evidence, recommend imprisonment in the State Prison for life, in which case the sentence of the court shall be imprisonment for life without benefit of release as provided in sections 3002, 3020 and 8827, provided, if the person accused elects to be tried by the court and is found guilty or if such person is convicted by confession, the court may, in its discretion, imprison such person in the State Prison for life without the benefit of release as provided in sections 3002, 3020 and 8827."

confinement, if the parole board decided to grant parole under General Statutes § 8827, and also would have the chance, from time to time during his period of confinement, of seeking further reductions in the sentence from the board of pardons. Section 3266d in terms deprives him of these avenues for seeking clemency. The fundamental contention of the accused is that the statute gives the jury no guide for determining whether the recommendation for clemency should be made and that for this reason he is denied the equal protection of the laws. Secondarily, he claims that the operation of the statute has denied him due process of law. There is no claim that the court did not charge the jury properly under the statute if it was constitutional.

Originally, in Connecticut, the penalty for murder was death. In 1846 it came to be felt that there were only certain types of murder in which that punishment was warranted. Public Acts 1846, c. 16. These were described in what is now General Statutes § 8350 and were designated murder in the first degree. Any other kind of murder was designated murder in the second degree. The penalty for murder was reduced from death to life imprisonment except in the case of murder in the first degree, where the death penalty was retained until § 3266d superseded § 8351. Thus, the legislative purpose in subdividing the crime of murder into the classifications of first and second degree was to eliminate the death penalty in all cases of murder not falling within the types classified as murder in the first degree. *State* v. *Dowd,* 19 Conn. 388, 392. Section 3266d further ameliorated the punishment for murder in the first degree, which alone it affected. Under it, the punishment continued to be death "unless the jury shall, by its verdict and as a part thereof, upon and after a

consideration of all the evidence, recommend imprisonment in the State Prison for life, in which case the sentence of the court shall be imprisonment for life without benefit of release" by parole or application to, and action by, the board of pardons. A similar provision was made where the accused elected trial by the court instead of by the jury.

It is important to note that neither before nor after the enactment of § 3266d was there any power whatsoever in the board of parole in the case of one convicted of murder in the first degree. The sole escape from death open to such a one was through application to the board of pardons, which had the power, if it thought the facts warranted it, to commute the penalty to life imprisonment. General Statutes § 3020. If and when the sentence was so commuted, the board of parole, under General Statutes § 8827, could release the prisoner on parole, as one serving a life sentence, in the same way as in the case of any other prisoner serving a life sentence—for instance, one convicted of murder in the second degree. But there was no power in the board of parole to alter, reduce or in any other way ameliorate the punishment for murder in the first degree unless and until the board of pardons had commuted the sentence to life imprisonment. Thus one important effect of § 3266d has been to transfer from the board of pardons to the jury, in a case where the jury have found the accused guilty of murder in the first degree, the power to determine that the penalty shall be life imprisonment instead of death.

Since there was no change in the legal ingredients of the crime of murder in the first degree, the General Assembly could hardly have set up any standard for the jury to follow in making the determination to exercise clemency. Nor had any standards been set for

the exercise of this power by the board of pardons. General Statutes § 3020 (a). A multitude of imponderable factors coming to mind in the course of a trial might well lead a jury of twelve persons to feel that the death penalty was too severe in the case of one found guilty of murder in the first degree. But if such a decision is reached, it is not on the basis of any differentiation in the legal elements of the murder as in the case of murder in the first degree and murder in the second degree. No legal right is involved. There is merely the privilege of asking for clemency. Whether it will be granted is not determined on any standards subject to judicial review, nor has there ever been provision for any judicial review of such an action when taken by the board of pardons. Consequently, in being deprived of an opportunity to appeal to the board of pardons, this accused is not deprived of any right. See *State* v. *Donahue,* 141 Conn. 656, 665, 109 A.2d 364.

Of course the constitutional rights of the accused are not, and could not be, claimed to be in any way impinged upon by reason of the fact that the statute authorizes the jury to provide in a first degree verdict that the penalty shall be imprisonment for life, instead of death, apart from the effect of such an action by the jury on the power of the accused to appeal to the board of pardons and, if a commutation is granted, to appeal after the requisite years of confinement to the board of parole for release. Statutes of such general import have been in effect for many years and have been upheld against attacks of all types. 26 Am. Jur. 562, § 574. Cases involving statutes authorizing the jury to make a recommendation which is binding upon the court are collected in an annotation in 17 A.L.R. 1117, 1118, which is supplemented in 87 A.L.R. 1362, 1363 and 138 A.L.R.

1230, 1231. Since 1897, in federal cases, the jury has had the right in cases of first degree murder to fix the penalty as death or life imprisonment at hard labor, and the statute authorizing this was construed and upheld in *Winston* v. *United States,* 172 U.S. 303, 313, 19 S. Ct. 212, 43 L. Ed. 456. Both claims as to the unconstitutionality of the statute are thus disposed of, quite without regard to the fact that the failure of the accused to raise the point until long after the trial was over disentitled him to any consideration of either.

The final claim of the accused is that the verdict should be set aside as against the evidence. We do not propose to enter into a long summary of what the jury might have found proven. The claim lacks sufficient merit to justify such treatment. Not only was the verdict of guilty of murder in the first degree fully warranted but there would have been no justification for setting it aside.

There is no error.

In this opinion the other judges concurred.