STATE OF CONNECTICUT *v.* ARISTIDES BENITEZ, JR.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued December 11, 1968—decided January 8, 1969

*James D. Cosgrove,* public defender, for the appellant (defendant).

*John D. LaBelle,* state's attorney, with whom, on the brief, was *George D. Stoughton,* assistant state's attorney, for the appellee (state).

HOUSE, J. On November 2, 1966, the defendant was found by a jury to be guilty of the crime of murder in the first degree and has taken this appeal from the judgment rendered on that verdict. Our decision with respect to one of the defendant's

assignments of error is dispositive of this appeal.

The facts necessary to an understanding of our decision may be briefly stated. Ralph Rothschild, who was about seventy-two years old, resided on the second floor of a three-family house at 181 Vine Street in Hartford. With his nephew he operated a meat market at 1658 Main Street in Hartford. On October 30, 1965, he left the store at about 7:45 p.m. to go home, taking with him in a paper bag the day's receipts, which amounted to about $2500 in cash. Mrs. Phyllis Brodeur, an occupant of the first floor of the three-family house at 181 Vine Street, while taking her small grandchild to the front door at about 8:15 p.m. to observe children passing in Halloween costumes, noticed three young men leave her porch and go around the side of the house. She walked onto the porch to see if anything had happened. As she went back into the house, she saw Rothschild and observed that he had just left the sidewalk and was proceeding up the walk into the house. Very shortly thereafter, there was a commotion in the hallway, and Mrs. Brodeur's daughter, a registered nurse, went out and found Rothschild sitting on the steps bleeding from his head. He put his hand to his head and said: "A man hit me." He died the next morning. There was medical testimony that the cause of death was a blow to the head by a blunt force which fractured his skull.

On the evening of December 13, 1965, the defendant was taken to the Hartford police station. He was eighteen years old and spoke Spanish. He was interviewed by Detective Juan Roman, a Spanish-speaking police officer. The officer informed him that he wished to question him about the Vine Street incident but that he had a right to remain silent, that he was entitled to have a lawyer whether or not he

had money to retain one, and that anything he said could be used against him. The officer explained to him about the services of a public defender. The defendant then remained silent. When the officer asked the defendant whether he wanted to tell him anything at all, the defendant said that he denied everything.

Later that evening, an older friend of the defendant, at the friend's request, talked to the defendant alone in an interrogation room at the police station and advised him that if he had anything to do with the case it would be better for him to speak up. The defendant then told his friend the details of the incident on Vine Street. Unknown to the defendant and his friend, there were microphones in the interrogation room, and the police listened to their conversation. After the conversation with the defendant, his friend came out of the interrogation room and told the police what the defendant had told him. Detective Roman then entered the interrogation room, told the defendant that he was under arrest and again warned him of his rights, that the charge was murder, that anything he said could be used against him in court, that he was entitled to have a lawyer whether or not he had money and that he was entitled to remain silent. After this arrest and warning, the defendant told the officer what he had already told his friend about his connection with the Vine Street incident. His oral statement was reduced to writing in Spanish and translated into English, and the defendant read it and signed it and swore to the truth of it before a notary public. A short time later, the defendant gave the officer a supplemental statement amplifying the statements he had already made. The police did not make any promises to the defendant with respect to leniency

in connection with any statement he might give, nor did they threaten him or do anything in order to induce him to give either the oral or the written statements, and when he gave them he did not know that the police had overheard his conversation with his friend.

At the trial, in the absence of the jury, the court held a lengthy preliminary hearing concerning the admissibility of the defendant's oral and written statements. It then ruled that, although any evidence obtained as a result of the use of microphones in the interrogation room was inadmissible,[1] the defendant had been given an adequate warning as to his constitutional rights before he gave any oral or written statement to the police, that he had knowingly and intelligently waived his constitutional rights and gave the statements freely and voluntarily and that they were admissible into evidence. The defendant duly excepted to this ruling and has assigned it as error.

That the defendant's confessions were material factors in the jury's conclusions that the defendant was an accessory to the murder of Rothschild cannot be doubted. In them, the defendant admitted that, with two other men on the night of October 30, 1965, he waited in a car until an old gentleman, who lived on Vine Street and who, the others told him, had about $1500, left his store and entered his automobile. The three then drove to Vine Street, arriving before the intended victim. They hid on the porch waiting for him. The plan was that the other two were to hold the victim while the defendant was to take the money from him. People on the first floor were watching television. While they were waiting,

---

[1] This ruling was not appealed. See, however, *State* v. *Vollhardt*, 157 Conn. 25, 29, 244 A.2d 601.

the others told the defendant that they had been spotted, and all three ran off the porch. The defendant ran directly to the car, but the other two went around the building and came back to find the man as he came in. After about one minute, the other two came running to the car. They bent down and put something under the front seat and then drove off. They told the defendant that one had hit the old man and knocked him out but that they did not take the money because they were seen. They then all drove to Simsbury, where one of the men took a night stick from under the front seat. It was about a foot long and had a leather strap.

The dates which we have mentioned are significant: Rothschild was attacked on October 30, 1965; the defendant's statements to the police were given on December 13, 1965; and the trial was concluded on November 2, 1966.

On June 13, 1966, the United States Supreme Court decided the case of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. The majority opinion in that case, written by Chief Justice Warren, notes (p. 439) that the decision deals "with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." In summary, that decision states (p. 471): "Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent

and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead."

More specifically, the opinion expressly states (p. 474) that "if the police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation." It then states (p. 479): "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."[2]

Subsequently, on June 20, 1966, in the case of *Johnson* v. *New Jersey*, 384 U.S. 719, 721, 86 S. Ct.

---

[2] During the argument of the present case, the state's attorney furnished to the court a copy of the post-*Miranda* forms which his office has supplied for use by police officers in Hartford County and which read as follows:

"*WARNING*

The constitution requires that I inform you of your rights:

You have a right to remain silent. If you talk to any police officer, anything you say can and will be used against you in Court.

You have a right to consult with a lawyer before you are ques-

1772, 16 L. Ed. 2d 882, the United States Supreme Court decided that its holding in the *Miranda* case was not retroactive but did apply to persons whose trials had not begun as of June 13, 1966.

As we have noted, the interrogation of the defendant was on December 13, 1965, prior to the June 13, 1966, decision in the *Miranda* case, but the trial was in November, 1966, after the *Miranda* decision. The holding of the United States Supreme Court in the *Miranda* case, accordingly, governed the admissibility of evidence in the present case.

Although the interrogating officer approximated remarkably well the as yet unannounced precise pro-

---

tioned, and may have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning.

If you wish to answer questions you have the right to stop answering at any time.

You may stop answering questions at any time if you wish to talk to a lawyer, and may have him with you during any further questioning.

Place<br>Date<br>Time

*WAIVER*

I have been advised that:

I have the right to remain silent.

If I talk to any police officer, anything I say can and will be used against me in Court.

I have the right to consult with a lawyer before I answer any questions and I may have a lawyer with me during questioning.

I have the right to have a lawyer appointed for me, if I cannot afford one, before I answer any questions.

I know that if I answer questions, I have the right to stop answering at any time.

I may stop answering questions at any time if I wish to talk to a lawyer, and I may have him with me during any further questioning.

I am willing to answer questions and make a statement knowing that I have these rights. I do not want a lawyer. I know and understand what I am doing. I do this freely and voluntarily, and no threats or promises have been made to me."

cedures required by the *Miranda* decision, he failed to anticipate the specific requirement of that decision that before interrogation it was necessary not only that the suspect be informed of his right to remain silent and his right to the services of an attorney, at the expense of the state if he could not afford one, but that, if he was unable to afford a lawyer, then one would be provided for him "prior to any interrogation" and that he had the right to stop answering questions at any time. As we understand the *Miranda* decision, it is not until after all of the required warnings, including these two, have been given that the individual may be held to have knowingly and intelligently waived these rights and to have agreed to answer questions or make a statement. "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda* v. *Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

It does not appear that before questioning the defendant the interrogating officer informed him not only of his general right to the presence and services of an attorney but also, specifically, of the right to such presence and services prior to any interrogation and that if he did answer questions he had the right to stop answering at any time. Under the holding of the United States Supreme Court in the *Miranda* case, accordingly, the trial court erred in admitting into evidence the confessions of the defendant. The decision in that case is controlling notwithstanding any prior decisions of a state court which would lead to a different result.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.