STATE OF CONNECTICUT *v.* JOHN W. RALLS

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued October 1—decision released December 31, 1974

*John R. Williams,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Richard P. Sperandeo,* chief assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant, John W. Ralls, was indicted by a grand jury for the crime of murder in the first degree in that he "wilfully, deliberately and

premeditatedly did shoot one Barbara Howell . . . in violation of section 53-9 [repealed by Public Acts 1969, No. 828, effective October 1, 1971] of the General Statutes of Connecticut." A jury returned a verdict of guilty of murder in the second degree. The defendant has appealed.

Of the sixty-three assignments of error advanced by the defendant, thirty have not been briefed and are considered abandoned. *State* v. *Weston*, 164 Conn. 635, 636, 325 A.2d 457; *State* v. *Bitting*, 162 Conn. 1, 3, 291 A.2d 240.

The remaining thirty-three assignments of error, variously presented, form the issues on this appeal,[1] and specifically involve claims that: (1) the evidence was insufficient to support a verdict; (2) errors were

[1] Since the offers of proof are unnecessary to a determination of these issues, the assignments of error which seek corrections in them need not be considered. *State* v. *Ferraro*, 164 Conn. 103, 105, 318 A.2d 80. Ordinarily, however, the validity of a claim which goes to the substance of the court's charge or the refusal to charge is tested by the claims of proof. Practice Book §§ 609, 635; *State* v. *Edwards*, 163 Conn. 527, 528, 316 A.2d 387; *State* v. *Brown*, 163 Conn. 52, 58, 301 A.2d 547. Of the nine assignments of error directed to the finding, one is irrelevant to the issues briefed. The remainder request additions to the finding which would expressly indicate the court's failure to instruct on, comment on or strike testimony or which would indicate the public defender's failure to move to strike, object to or request instructions on the evidence. These requested corrections are implicit in the finding as set forth. A finding need not be in language identical with the draft finding. *Walsh* v. *Turlick*, 164 Conn. 75, 77, 316 A.2d 759. Moreover, where these requested inclusions are relevant to the defendant's claim of incompetent counsel they are unnecessary. When such a claim is raised the entire record and transcript may be used to review the omissions and commissions of defense counsel. *Palmer* v. *Adams*, 162 Conn. 316, 323, 294 A.2d 297; *State* v. *Costello*, 160 Conn. 37, 40, 273 A.2d 687. Since they are unnecessary, the requested corrections will not be made. See *Lewis* v. *Lewis*, 162 Conn. 476, 481, 294 A.2d 637.

committed in the admission of evidence; (3) the court's supplementary charge was coercive; and (4) effective assistance of counsel was denied.

The defendant claims that there was insufficient evidence to submit the case to the jury, and hence, it was error to render judgment on the jury's verdict. This issue must be tested by the evidence presented in the appendices to the briefs. *State* v. *Cobbs,* 164 Conn. 402, 424, 324 A.2d 234; *State* v. *Kearney,* 164 Conn. 135, 136, 318 A.2d 100; *State* v. *Mayell,* 163 Conn. 419, 421, 311 A.2d 60. From the evidence printed in the appendix to the defendant's brief, the jury could reasonably have found the following facts: On Sunday, March 1, 1970, at about 1 or 1:30 p.m., the body of Barbara Howell, the defendant's mother-in-law, was discovered on the floor of a red Chevrolet parked behind the First National store on Dixwell Avenue in Hamden. Death had occurred between 9 and 11 a.m. that day, and had been caused by multiple gunshot wounds to the head and chest from a .32 caliber semiautomatic pistol.

A search of the automobile revealed three spent .32 caliber cartridge casings, and one expended .32 caliber bullet. Two other bullets were removed from the victim's body. Of the five latent fingerprints lifted from the interior of the car, the only fingerprint with sufficient identifying characteristics was a thumbprint of the defendant taken from the right vent window.

At the time of the murder, the defendant was separated from his wife and lived with his three daughters at the home of his parents. Gwendolyn Ralls, the defendant's wife, left him in September, 1969, after he had stabbed her in the leg. In May, 1969, she had Ralls arrested for aggravated assault

after he hit her with a bottle. The defendant, on several occasions, had threatened to kill her and her mother, Barbara Howell.

Around 5 a.m. on March 1, 1970, Ada Rawls, the defendant's mother, told the defendant to call his sister who had received a letter for the defendant from his wife. The defendant made the telephone call, and, after speaking, he became upset and went to bed. Mrs. Rawls did not know about the defendant's feelings towards his mother-in-law but admitted that she had previously told the police that he had threatened to "get" his wife and his mother-in-law.

The defendant left his home on March 1, 1970, around 9 a.m. and drove his car, a black Oldsmobile, to the home of Barbara Howell to pick up some clothes for his three children. The defendant returned home with the clothes, left again and was seen driving away with the deceased in her Chevrolet shortly before 10 a.m. The defendant came home around 3 p.m. that afternoon, went out, returned at 6 or 7 p.m. that evening and then left again.

The defendant's daughter, Sharron, aged eight, had seen a gun when her sister, Michelle, aged five, had laid it on the floor of their bedroom in the presence of her sister Jacquelyn and herself. Jacquelyn, aged nine, testified that her sister had told her that their father was going to hurt their grandmother, but that she asked him and he said "no."

Donald Rawls, the defendant's brother, had seen the defendant with a gun on the two nights before the Sunday that Mrs. Howell was killed. Donald Rawls told the police that the gun he had been shown

by the defendant was a .32 automatic. The defendant had told him that Gwendolyn, the defendant's wife, would not live to see Monday.

The defendant went to the apartment of Samuel F. Bowens in West Haven on March 1, 1970, sometime between 10:30 and 11 a.m., and asked Bowens to cash a $500 United States Chemical Corporation check. The defendant had owed Bowens some money and received $300 for the check. Ralls left about 11 a.m. Bowens did not see any car driven by the defendant, but the defendant had said nothing about his car running out of gas or breaking down.

Charles Cook, the defendant's coworker at United States Chemical, had seen the defendant one day at work in February, 1970, with a gun which appeared to Cook to be an automatic. Also, in February, 1970, the defendant had said to Donna Burkman, office manager for United States Chemical, where the defendant was employed, that if he had had a gun "last night" he would have killed his mother-in-law, his mother and his three children. He stated to her that his mother-in-law interfered in his marriage. After the homicide, on March 2 and 3, Donna Burkman discovered that two payroll checks made out to Ralls in advance and five blank checks, as well as $80 in petty cash, were missing from the office. One of the blank checks was the $500 check which Bowens had cashed on March 1, 1970.

On the afternoon of Wednesday, March 4, 1970, the defendant went to Samuel Bowens' apartment and spoke with Mrs. Bowens for about ten minutes when the police arrived and arrested him at approximately 5:30 p.m. At the time of his arrest the defendant had in his possession an envelope containing four checks and a petty cash receipt.

When asked by the arresting officer about the weapon used to shoot Mrs. Howell, the defendant denied ever having a gun. He was taken to the West Haven police department and booked. While being transported to the Hamden police department for photographs and fingerprints, the defendant told detectives that on Saturday evening, February 28, 1970, his automobile had broken down in West Haven on Orange Avenue in front of a Dunkin' Donut shop. He left his car and hitchhiked a ride home from an unknown male. The next morning, March 1, he started to walk to the home of Barbara Howell to pick up his children's clothes and on the way met James Senior who drove him to the Howell home. The defendant stated that Barbara Howell drove him home where he dropped off the clothes at about 9:45 a.m. He told Mrs. Howell that his car had run out of gas; he asked her to drive him to his car on Orange Avenue by the Dunkin' Donut shop in West Haven. They first stopped at an Atlantic gas station on the corner of Goodrich Street and Shelton Avenue to fill a gas can which was in the Howell car and then drove to the Orange Avenue Dunkin' Donut shop in West Haven. He transferred the gas to his car, started his car, and returned the gas can to Mrs. Howell. That was the last he saw of her. The defendant stated this was around 10:15 or 10:30 a.m. He said he returned home, went out, came back and went out again. The defendant explained that later that evening he learned that Mrs. Howell had been murdered, and that he went into hiding because he knew he would be blamed. The defendant at all times denied his guilt to the police.

The defendant's account to the police of his activities was contradicted by several witnesses. James Senior saw the defendant on March 1, between 10:30

and 11 a.m., walking away from Dixwell Avenue where the body of Barbara Howell had been discovered. The defendant got into Senior's car and asked Senior to drive him to his car on Winchester Avenue, the street on which Barbara Howell lived. The ride took about three minutes. There had been no reports to the police about a disabled car in front of the Dunkin' Donut shop on Orange Avenue on the night of February 28, 1970.

Neither an employee of Dunkin' Donuts nor the manager of a car wash next door observed a disabled vehicle in the street when he arrived at work early in the morning on Sunday, March 1. Finally, the two men who were working at the gas station where the defendant said he and Barbara Howell had stopped testified that they had not sold gasoline in a gas can to anyone that morning. No gas can was found in the Howell automobile.

It is clear that the defendant's claim that there was insufficient evidence to support a jury verdict is totally without merit.[2]

The defendant next claims that the admission into evidence of his fingerprint card denied him due process of law. During testimony by Sergeant

---

[2] At the conclusion of the state's case, defense counsel orally moved for dismissal on grounds that there was no direct evidence that the defendant had committed the crime. The denial of a motion to dismiss is not properly assignable as error. *State* v. *Dubina*, 164 Conn. 95, 101, 318 A.2d 95; *State* v. *Anderson*, 152 Conn. 196, 198, 205 A.2d 488. No subsequent motions for a directed verdict or to set aside the verdict were made. Hence, this issue is not properly before us. Practice Book § 652. We have considered this claim solely because appeal counsel points to the public defender's failure, inter alia, to move to set aside the verdict as support for a claim of ineffective assistance of counsel. See pp. 427–31, infra. In the face of the overwhelming evidence of guilt, it can hardly be said that these omissions are indicative of incompetency.

James E. McDonald, a state policeman, concerning the fingerprints lifted from the interior of Barbara Howell's automobile, the sergeant identified the defendant's fingerprint card as one "which was on file at the Bureau of Identification, also C.S.P.I. 227299." In response to the question, "What is the C.S.P. number," Sergeant McDonald stated, "It is a central bureau for all the criminal arrest records in the State of Connecticut." The court interrupted with "Just a moment. I ought to caution this jury at this particular time, that whatever it was, it might have been just a minor matter. I don't know the extent of it. It doesn't affect this case, nor is it introduced for that purpose."

At defense counsel's request the jury were excused. In the absence of the jury the court expressed that it could duly caution the jury, but that it was dangerously close to a mistrial. The defendant's counsel moved for a mistrial, which the court denied. An exception was noted. When the jury returned, the prosecutor stated, "I want to make it perfectly clear that the only purpose of offering this card is to show that Sergeant McDonald compared a latent print with the prints of John Ralls." The court then cautioned, "I don't know what the extent it covers, whether it might have been some minor matter, or it may have been an application of employment. You are not to give it any more weight than that. This man is being tried here on this case only." The fingerprint card of the defendant was then received and marked as an exhibit.

While the state is technically correct in asserting that no specific objection was made to the card's admission, we feel that the defendant's motion for mistrial which went to the manner of in-court iden-

tification of the card, a condition precedent to its being received in evidence, is sufficient objection to allow our consideration of the claim as advanced. *State* v. *Savage,* 161 Conn. 445, 449, 290 A.2d 221.

The contention is that the defendant was prejudiced because the fingerprint card exhibit and the testimony surrounding its admission tended to prove the commission of crimes other than that charged and unconnected with the case being tried. That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material; *State* v. *Marshall,* 166 Conn. 593, 353 A.2d 756; *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368; see *State* v. *Jenkins,* 158 Conn. 149, 152–53, 157, 256 A.2d 223; and if the trial judge determines in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency. *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219; *State* v. *Holliday,* supra, 173.

Under the principles of real or demonstrative evidence, authenticated fingerprints may be introduced into evidence and compared with other fingerprints found at or near the scene of a crime. 1 Wharton, Criminal Evidence (13th Ed.) § 192; 29 Am. Jur. 2d, Evidence, § 375. Such evidence as a useful system of identification has long been recognized and its admission, when competent, relevant and material, has long been accepted. *State* v. *Chin Lung,* 106 Conn. 701, 723, 139 A. 91.

The admission of a fingerprint record containing extraneous material which in itself is incompetent, however, may constitute reversible error depending on whether the evidence of past crimes has been

masked or obliterated; see *Riley* v. *Sigler,* 437 F.2d 258 (8th Cir.); *Sibley* v. *United States,* 344 F.2d 103 (5th Cir.); *Moon* v. *State,* 22 Ariz. 418, 198 P. 288; *State* v. *Viola,* 82 N.E.2d 306 (Ohio App.); or whether the prejudicial matter was before the jury. See *United States* v. *Dressler,* 112 F.2d 972 (7th Cir.); *People* v. *Van Cleave,* 208 Cal. 295, 280 P. 983; *Manor* v. *State,* 223 Ga. 594, 157 S.E.2d 431; see also annot., 28 A.L.R.2d 1115, 1135–36.

Since all the exhibits have been certified to this court and the contents thereof have been made a part of the finding, we have examined the fingerprint card for such prejudicial material[3] and have concluded that the exhibit as offered to the jury revealed no actual evidence of past crimes. The jury, at most, was exposed to an implication of arrest without any indication of conviction, which was dispelled by the court's cautionary instructions as to the limited purpose for which the fingerprint card was offered and as to the possibility that the prints were taken for a purpose unrelated to crime, such as employment. In this age and particularly in these times it is a matter of common knowledge that fingerprinting is used in numerous branches of civil service and is not itself a badge of crime. *Edmonds and Stanley* v. *State,* 5 Md. App. 132, 245 A.2d 618. Whenever a fingerprint card is introduced as evidence, however, an implication of criminal history potentially arises which, of course, should be dispelled. Certainly,

[3] On the rear of the card at the top left corner is printed "Connecticut State Police, Hartford 1, Conn."; at the rear right, "State Bureau of Identification." At the rear bottom of the card is the statement, "Please furnish all additional criminal history and police record on separate sheet." Also, on the front of the card appears the date February 10, 1970. The rear portion of the card indicating a criminal history or record is covered by white paper taped to the back of the card.

the better practice is to cover every questionable element of the card, including dates and other printed matter.

No error was committed in denying the motion for mistrial, and admitting the fingerprint exhibit. The court, in the exercise of its judicial discretion, could properly determine that the probative value of the evidence outweighed its prejudicial tendency; *State* v. *Moynahan,* supra; *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689; *State* v. *Holliday,* supra; and that, by its cautionary instructions, the defendant would be assured a fair and just outcome. *State* v. *Grayton,* 163 Conn. 104, 112, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495; *State* v. *Bausman,* 162 Conn. 308, 312, 294 A.2d 312; *State* v. *Savage,* 161 Conn. 445, 449, 290 A.2d 221. Further, during the course of the trial, evidence was produced and admitted without objection that the defendant had been arrested for assault on his wife.

The defendant next claims that activities conducted in the absence of his trial attorney denied him the assistance of counsel at critical stages of the proceedings and violated the sixth amendment. It is central to the constitutional principle that the accused shall enjoy the right to have the assistance of counsel for his defense and that "he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States* v. *Wade,* 388 U.S. 218, 226, 87 S. Ct. 1926, 18 L. Ed. 2d 1149; see *United States* v. *Ash,* 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619.

The record discloses that sometime before 8:07 p.m. on the night of the verdict the defendant's public defender left the courthouse and did not return. During his absence the jury were instructed on two separate occasions and returned their verdict.

The simple answer to the defendant's claim is that the record also discloses that an assistant public defender for New Haven County appeared for the defendant in the absence of the public defender.

During this period, the court called the jury to give them supplemental "Chip Smith" instructions; see *State* v. *Smith,* 49 Conn. 376, 386; instructed the jury, in answer to their question: "In case of a murder one verdict, are we the sole judges of penalty of life imprisonment or death?"; and received the verdict of the jury. At no time during this period did any factual or adversary issues arise; the only matters which faced the assistant public defender concerned questions of law. At all times during this stage of the proceeding, the defendant stood with counsel competent to represent and protect him. The claim of a sixth amendment violation is without merit.

Approximately two hours and forty-five minutes after the jury began their deliberations, at about 5 p.m., a time at which, traditionally, juries are excused for the day and in most instances even during their deliberations after a case has been submitted to them, the trial judge recalled the jurors into the courtroom, and the following occurred:

"The Court: I have called you all because of the hour. I am not trying to hurry your deliberations at all. I want you to have time enough to consider them, and consider them with all the thought that

you can. However, I would like to know if it is a matter of a couple of hours, I can send out and get sandwiches. If it is a matter of more than that, and you want to have dinner, it can be arranged. I can send out and make those arrangements. *I cannot allow you to leave before I have some sort of a verdict.*

"*You can readily see, if somebody got sick overnight, I would have to declare a mistrial, and this case would have to start all over again. It would be an impossibility.* [Emphasis added.]

"Is anybody in a position to tell me how long you feel that you want, or whether sandwiches would do, or would you like a sitdown dinner?

"A Juror: I think it is going to be a while.

"The Court: That is all I need to know. You may retire to the jury room, and arrangements will be made. Thank you very much."

The defendant asserts that the italicized statements made by the trial judge to the jurors were violative of his constitutional right to due process of law and trial by an uncoerced jury. Despite the defendant's failure to raise this claim in the trial court, we consider it because a fundamental right is involved and review may be made upon the record. *State* v. *Chesney,* 166 Conn. 630, 353 A.2d 783; *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576.

The possibility of disagreement by the jury is implicit in the requirement of a unanimous verdict and is part of the constitutional safeguard of trial by jury. See *United States* v. *Harris,* 391 F.2d 348, 355 (6th Cir.); *Thaggard* v. *United States,* 354 F.2d 735, 740 (5th Cir.) (Coleman, J., concurring specially); *Jenkins* v. *United States,* 330 F.2d 220, 222 (D.C. Cir.) (Wright, J., dissenting), rev'd, 380 U.S.

445, 85 S. Ct. 1059, 13 L. Ed. 2d 957; *Green* v. *United States*, 309 F.2d 852, 856 (5th Cir.). For a judge to tell a jury that a case must be decided and that a mistrial would be an impossibility is not only compelling in nature but is misleading in fact. While a defendant is not entitled to an instruction that a jury may "hang"; *United States* v. *Sawyers*, 423 F.2d 1335, 1340 (4th Cir.); *United States* v. *Bowles*, 428 F.2d 592, 596 (2d Cir.), cert. denied, 400 U.S. 928, 91 S. Ct. 193, 27 L. Ed. 2d 188; he is entitled to a jury unfettered by an order to decide. *Jenkins* v. *United States*, 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957. When considered out of context, the statements in issue convey such an order, and, as such, constitute an impermissible, albeit undesigned, transgression into the province of the jury.

In assessing the impact of these statements, however, we must consider them from the standpoint of their effect upon the jury in the context and under the circumstances in which they were given. See *Jenkins* v. *United States*, 380 U.S. 445, 85 S. Ct. 1059, 13 L. Ed. 2d 957. We are not unmindful that a judge occupies a role of inherent power and dignity that commands a deference from the jury impossible to appraise precisely and that "[w]hat he tells the jury . . . has great weight with them." *LaChase* v. *Sanders*, 142 Conn. 122, 124, 111 A.2d 690. The charge to the jury, however, must be read as a whole, and an attempt to assert reversible error by culling a single phrase or inaccurate statement must fail unless it is reasonably probable that the jury were misled. *State* v. *Tropiano*, 158 Conn. 412, 433, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288; *Penna* v. *Esposito*, 154 Conn. 212, 215, 224 A.2d 536; *Allard* v. *Hartford*, 151 Conn. 284, 292, 197 A.2d 69.

The judge's statements, to a jury which had shown no indication of a deadlock, were made "because of the hour" to explain the reason for retaining them through suppertime and to explain the potential for mistrial if a released juror were to become ill overnight. The judge prefaced these remarks with, "I am not trying to hurry your deliberations at all. I want you to have time enough to consider them, and consider them with all the thought that you can."

Even if there were a potential for misconstruction, this case does not present any evidence of coercion. The jury had shown no indication of a deadlock; there was no hint as to division. The uncontroverted facts showed beyond any reasonable doubt the guilt of the accused. After the court's 5 p.m. inquiry, the jury continued deliberations for several hours, and did not return a verdict until 9:25 that evening. Moreover, the jury, both prior to and after the statements complained of, received the "Chip Smith" instructions relating to the duty of a jury to attempt to agree.[4] The defendant claims that the "Chip

---

[4] The words, as used in *State* v. *Smith*, 49 Conn. 376, 386, are: "Although the verdict to which each juror agrees must, of course, be his own conclusion and not a mere acquiescence in the conclusions of his fellows, yet in order to bring twelve minds to a unanimous result, the jurors should examine with candor the questions submitted to them and with due regard and deference to the opinions of each other. In conferring together the jury ought to pay proper respect to each other's opinions, and listen with candor to each other's arguments."

The court included in its original charge to the jury the following: "As you know, your verdict must be unanimous. It is true, of course, that the verdict to which each juror agrees must be his own conclusion and not mere acquiescence in the conclusion of his fellows. But that does not mean that each juror should pursue his own deliberations and judgment with no regard for the arguments and conclusions of his fellows, or that, having reached a conclusion, he or she should obstinately adhere to it without a conscientious effort to test its validity by other views entertained by other jurors on the jury, equally wise and justly resolved to do their duty."

Smith" instruction, which was given sua sponte at about 8 p.m., exacerbated any coercive effect of the statements in issue.[5]

The defendant alleges that the thrust of the court's instruction, which did not quote *State* v. *Smith* verbatim, urged the minority jurors to yield to the view of the majority, and that it was coercive to give the charge sua sponte and "without any indication of a jury deadlock." We disagree. "We repeat the language in *State* v. *Walters,* 145 Conn. 60, 63–64, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45: 'The attack on the charge from *State* v. *Smith* [49 Conn. 376, 386] on the ground that it amounted to a direction that the verdict be whatever a majority of the jurors thought is without semblance of merit. The accuracy of the charge as a statement of the jurors' duty is not open to question. Its use has been approved by the Supreme Court of the United States. *Allen* v. *United States,* 164 U.S. 492, 501, 17 S. Ct. 154, 41 L. Ed. 528. Better than any other statement which has come to our attention it makes clear the necessity, on the one hand, of unanimity among the jurors in any

[5] The court said: "Good evening, ladies and gentlemen. I sense that you must be having a little difficulty in reaching your verdict. However, as I have told you time and again, your verdict must be unanimous. It is true, of course, that a verdict to which each juror agrees, has got to be his own conclusion and not the mere acquiescence in or the conclusions of his fellows. That does not mean that each juror should pursue his own deliberations and judgment with no regard for the arguments and conclusions of his fellows, or that having reached a conclusion, he or she should obstinately adhere to it without a conscientious effort to test validity by the views entertained by the other jurors. I am not telling you what to do. I am going to send you back in. Follow that theory, that you will resolve yourselves to do your duty and follow the thoughts of other jurors whom, I am sure, are equally as wise and have heard the same evidence. You may return to the jury room, and I hope it has shed some light. Thank you."

verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors, something without which no intelligent body of twelve would be likely to reach a unanimous result in any case where there was any substantial factual dispute. *Allen* v. *United States,* supra. For practical reasons only, its use has customarily been deferred until after a disagreement has been reported. *State* v. *Schleifer,* 102 Conn. 708, 725, 130 A. 184. . . .' " *Tough* v. *Ives,* 162 Conn. 274, 278–79, 294 A.2d 67.

With respect to the court's language, "[n]o specific words are required if jurors are properly instructed that each juror's vote must reflect his considered judgment as to how the case is to be decided. If the jurors follow such an instruction . . . each vote will be for either conviction or acquittal and one of three decisions will necessarily result: (1) not guilty; (2) guilty; or (3) disagreement. The right to disagree is implicit." *United States* v. *Bowles,* 428 F.2d 592, 595–96 (2d Cir.), cert. denied, 400 U.S. 928, 91 S. Ct. 193, 27 L. Ed. 2d 188. The court's words, which taken as a whole tracked "Chip Smith" and accurately conveyed the juror's duty, could only go to mitigate any alleged misleading or coercive effect of the court's earlier remarks.

Even after the court had given the "Chip Smith" charge, the jury deliberated for another hour indicating that there was no coercion from the statement made by the court at 5 p.m. See *State* v. *Walters,* 145 Conn. 60, 63, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45. When they returned about an hour later, some four hours after the 5 p.m. statement, it was to inquire whether they would be judges as to the penalty. After the court replied in

the affirmative, the jury returned in ten minutes with the verdict. It is clear from this sequence that the jury's final agreement was not reached because of submission to any improper urging of the court, but upon their own deliberations and the answer given to them at the last inquiry. *State* v. *Bradley,* 134 Conn. 102, 112–13, 55 A.2d 114.

We cannot conclude that, in the context and under the circumstances in which these statements were made, the jury were, actually or even probably, misled or coerced. Thus, considering the three supplementary charges as a whole, the court was not in error in its instructions to the jury.

The defendant further claims that there was error in permitting the state to refresh the recollection of witnesses in the absence of a showing that recollection had been exhausted, in failing to instruct the jury as to the hearsay nature of the testimony of Jacquelyn Ralls, in admitting evidence through direct testimony of Gwendolyn Ralls that the defendant had committed other unrelated crimes, and in the court's failure to instruct the jury on the limited purpose of impeaching evidence.

With regard to some of these claims, no objection was made; to others, no exception was taken. With regard to all, the court was not informed of them in timely or distinct fashion during the course of the trial or by request to charge. See *State* v. *Smith,* 156 Conn. 378, 385–86, 242 A.2d 763; *State* v. *Bausman,* 162 Conn. 308, 313, 294 A.2d 312.

"We are constrained to determine the assignment of errors relating to a claimed violation of constitutional rights even though not raised at the trial level under circumstances previously stated, but claims

of error in evidentiary matters where no exceptional circumstances require a departure from our rule will not be considered." *State* v. *Chesney,* 166 Conn. 630, 353 A.2d 783.

The final assignment of error briefed by the defendant is that he was denied effective assistance of counsel. Proof of incompetent counsel is held to a stringent standard and where such a claim is raised, relief may be obtained only when representation has been so woefully inadequate as to make the trial a farce and a mockery of justice. *Palmer* v. *Adams,* 162 Conn. 316, 321, 294 A.2d 297; *State* v. *Costello,* 160 Conn. 37, 40, 273 A.2d 687.

In support of this claim counsel on appeal argues that the public defender "filed no pre-trial motions whatever on behalf of the defendant. He filed no written motions at trial. Although the state's circumstantial case was extremely weak, he did not even move for a directed verdict or move to set the verdict aside. He presented no evidence at trial. He failed to object to highly damaging and clearly inadmissible evidence. Most shockingly, as the jury retired to decide whether his client should be placed in jeopardy of death, he left the courthouse never to return. Neither the record nor the transcript discloses his reasons for thus disappearing."

In the course of this opinion we have discussed the merit of some of these claims incidentally, specifically the failure of trial counsel to move to set aside the verdict and the absence of trial counsel during the deliberation of the jury and the return of a verdict. See pp. 415–16, supra. The assertion is also made that trial counsel "failed to object to highly damaging and clearly inadmissible evidence." In support of this, appellate counsel claims that the

court improperly allowed into evidence "highly damaging" statements made by the defendant while in police custody on grounds that the *Miranda* (*Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694) warnings given by the arresting officer were inadequate.

Inspector Malcolm E. McHenry of the Hamden police department testified that immediately after the arrest he warned the defendant "that he had a right to remain silent, anything he said could and would be used against him in a court of law. I also told him that he had a right to an attorney, and the attorney could be present while he was being interviewed by the police. I further advised him that if he could not afford an attorney, one would be provided for him free of charge. I also advised him that he could terminate any interview with the police at any time he so desired, and I also advised him that any statements he did make would have to be given freely and voluntarily without any promises given."

The defendant contends that *Miranda* requires[6] that the suspect must be informed by *"express warning,"* that he is "entitled to have appointed counsel made available immediately," and "present at the station house or other place of interrogation," and that the warnings as given were inadequate.

In resolving questions of the adequacy of the warning, courts have given precedence to substance over form. *United States* v. *Lamia,* 429 F.2d 373,

---

[6] The suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda* v. *Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

376 (2d Cir.). "Words which convey the substance of the warning along with the required information are sufficient." *United States* v. *Vanterpool,* 394 F.2d 697, 699 (2d Cir.).

The words of warning to the defendant conveyed the substance of the *Miranda* requirement. The defendant was told that he had the "right to an attorney, and the attorney could be present while he was being interviewed by the police . . . that if he could not afford an attorney, one would be provided for him free of charge." The defendant having just been informed that he had a right to remain silent and that an attorney could be present while he was being interviewed by police was effectively warned that he need not answer any questions until an attorney was appointed if he so desired. That an attorney might not be available immediately or appointed until the time of presentment seems immaterial since the defendant was informed prior to questioning that he had the right to remain silent until the time when he did have an appointed attorney. See *Massimo* v. *United States,* 463 F.2d 1171, 1174 (2d Cir.); see also *United States* v. *Carneglia,* 468 F.2d 1084 (2d Cir.); *United States* v. *Lamia,* supra. We do not understand *Miranda* to require more. See *State* v. *Cobbs,* 164 Conn. 402, 417, 324 A.2d 234; *State* v. *Benitez,* 157 Conn. 384, 387, 254 A.2d 564.

The related claim that admission into evidence of these custodial statements violated §§ 54-1b and 54-1c of the General Statutes will not be considered except to comment that it is clearly without merit.

In another claim related to the defendant's in-custody statements, counsel on appeal asserts that

permitting the jury to hear that the defendant invoked his constitutional right to remain silent violated the fifth, sixth and fourteenth amendments.

During McHenry's testimony concerning the post-arrest conduct and statements of the defendant, the assistant state's attorney asked whether the defendant, while he was at the Hamden police department, received a call from anyone and from whom. McHenry answered that at 8 p.m. he received a call from an attorney who stated that he represented the defendant and wanted to speak with him. When the defendant "got off the phone, he stated, on the advice of his attorney, he was not going to carry on any further conversation with the police. I respected his wishes, and terminated any further interview with him." That was the last contact McHenry had with the defendant as far as interviewing him.

The court, on its own motion, cautioned the jury that after speaking with his attorney, the defendant had a perfect constitutional right not to discuss anything further with the officers and that it was not to militate against him.

It is well established that it is constitutionally impermissible for court or prosecutor to comment on a defendant's failure to testify in his own behalf. *Griffin* v. *California,* 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106. Because of an inference of guilt which arises, it is also impermissible for court or prosecutor to comment on the defendant's silence in the face of in-custody accusations or interrogation. *State* v. *Bates,* 140 Conn. 326, 99 A.2d 133; *State* v. *Ferrone,* 97 Conn. 258, 116 A. 336; see *Miranda* v. *Arizona,* supra, 468 n.37.

The cases which the defendant cites in support of his claim and which stand for these propositions are

inapplicable to the facts at hand. The defendant's statement that he would not carry on any further conversation was a voluntary one made after speaking with and on advice of counsel, as distinguished from a failure to deny an accusation. See *State* v. *Tryon,* 145 Conn. 304, 308, 142 A.2d 54.

McHenry's earlier testimony had indicated that the defendant, after being given the *Miranda* warnings, had, rather than remaining silent in the face of accusation and interrogation, made statements and answered questions. The testimony in issue went to show not only why the interview was terminated, but also that the defendant had an opportunity to speak with counsel and that the interview ceased when the defendant so desired. Under such circumstances, the testimony was neither impermissibly elicited nor improperly admitted. Moreover, the court's clear and emphatic instructions to the jury that the defendant had a perfect right to terminate the conversation and that it should not militate against him would go to dispel any adverse inference which might have arisen. See *State* v. *Tryon,* supra, 309.

Because these claims are so intertwined with the claim of incompetent counsel, we have decided to review them even though they were never raised and passed on in the trial court. Ordinarily, under such circumstances, some of these claims would not be considered. See *State* v. *Bartee,* 167 Conn. 309, 314, 355 A.2d 250.

As to appeal counsel's other assertions of incompetency, "[i]n determining whether a defense counsel was competent, we must be careful in using hindsight for in 'almost any case a hindsight combing of the record will reveal possible alternatives in trial

tactics.' *United States* v. *Ballard* . . . [423 F.2d 127, 134 (5th Cir.)]." *Palmer* v. *Adams,* 162 Conn. 316, 321, 294 A.2d 297. As we indicated in the *Palmer* case, referring to *Kruchten* v. *Eyman,* 406 F.2d 304, 312 (9th Cir.), the issue, therefore, is not what counsel should have done to constitute the proper representation of the defendant considering the case in retrospect, but rather, whether in the circumstances, as viewed at the time, the defendant received effective assistance of counsel.

Upon review of the record and the entire transcript, even if we were to apply a less than literal interpretation of the stringent standard for finding incompetent counsel, we cannot say that trial counsel's omissions or commissions amounted to representation so inadequate as to sustain such a claim.

There is no error.

In this opinion HOUSE, C. J., SHAPIRO and MAC-DONALD, Js., concurred.

BOGDANSKI, J. (dissenting). It has always been the policy of this state that it is more important to enforce the time-tested safeguards erected by the law for the protection of the innocent than to subvert them in order to prevent an apparently guilty person from escaping punishment. *State* v. *Holup,* 167 Conn. 240, 246, 355 A.2d 119; *State* v. *Mayell,* 163 Conn. 419, 428, 311 A.2d 60. In this case the trial court's instruction to the jury, considered in or out of context, was such an impermissible transgression into the province of the jury as to deprive the defendant of due process of law in violation of the fourteenth amendment to the United States constitution and article I § 8 of the constitution of this state.

A trial judge is forbidden to tell a jury that it must reach a verdict. In *Jenkins* v. *United States,* 380 U.S. 445, 85 S. Ct. 1059, 13 L. Ed. 2d 957, the trial judge told a deadlocked jury: "You have got to reach a decision in this case." The Supreme Court found that instruction to be coercive and reversed the conviction in a per curiam decision. The instruction in this case that *"I cannot allow you to leave before I have some sort of a verdict. You can readily see, if somebody got sick overnight, I would have to declare a mistrial, and this case would have to start all over again. It would be an impossibility* [emphasis added]," could only have had a coercive impact upon the jury and must be regarded as that kind of peremptory command by the trial judge so summarily condemned in *Jenkins* v. *United States,* supra.

"If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." *State* v. *Ferrone,* 96 Conn. 160, 169, 113 A. 452. "[T]he principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." *Jenkins* v. *United States,* supra, 446; cf. *Brasfield* v. *United States,* 272 U.S. 448, 47 S. Ct. 135, 71 L. Ed. 345; *United States* v. *Dunkel,* 173 F.2d 506 (2d Cir.).

I would find error, set aside the judgment and order a new trial.